# Exhibit A:

# Portions of the Trial Transcript

1    room.  Leave your notebooks in the jury room.  Do not take

2    them with you.  Leave them there at the end of the day.  And

3    this is important.  Your notes are for your own personal use.

4    They are not to be given to or read to any other juror.  You

5    may use them to refresh your recollection, but the official

6    record of what occurs during the trial will be the transcript

7    prepared by the court reporter, who's sitting right here.

8              Okay.  And with that, we're going to proceed to

9    opening statements.

10             Mr. Diederich, you ready to proceed?

11             MR. DIEDERICH:  Yes, Your Honor.

12             THE COURT:  You may do so.

13             MR. DIEDERICH:  Good afternoon, members of the jury.

14   My name is Mike Diederich.  I'm a lawyer.  I do employment

15   law.  My office is over in Rockland County.  And occasionally

16   I do civil rights law.

17             This case involves my client, Jerome Anderson, a

18   person, a human being.  A person, a human being.  He

19   originally filed the case pro se.  The Court let me know and

20   I ended up where I'm here today, representing him.

21             Mr. Anderson is originally a New Yorker, from

22   Upstate New York, Buffalo.  You'll hear from his testimony he

23   was born in Buffalo and then moved at age ten to Alabama.  He

24   had no significant problems as a child, but he smoked

25   marijuana.  As a high school student, that ended him up in a

1    injuries to his toes that are in the medical records.  They

2    used their batons on him, and there's three basically

3    separate occasions.  My client will talk about the initial

4    beating and then being transported to one location and being

5    beaten.  He goes to the hospital.  When he returns from the

6    hospital, he's met with another beating.

7           He also then received disciplinary treatment or a

8    sanction that ended up being 300 days in the special housing

9    unit which is a special unit to punish basically.  So he had

10   300 days administratively that was eventually overruled.

11          MS. COLLINS:  Objection, Your Honor.

12          MR. DIEDERICH:  Withdrawn.  So, he had

13   administrative housing 300 days and -- and he eventually left

14   Green Haven and is now in Elmira Correctional Facility up in

15   Elmira, New York.

16          I believe you have a task of deciding whether it's

17   my client's word against the correctional officers' word, and

18   that credibility determination will be yours.  I think it's

19   important for you to note, and the record supports this, that

20   in his entire history from 19 years of age until this

21   incident, which was in 2015, and until today, he never ever

22   assaulted a correction officer.  And as you'll hear from his

23   testimony, he knew -- he experienced the consequences of

24   being on the wrong side of correction officers from his

25   experience in Alabama and in New York.

Hennig-Direct-Diederich

1  what your client said or didn't say.  Your client hasn't

2  testified yet.  They don't know what he's going to say.

3  Q.   Officer Hennig, isn't it actually the case that you

4  escorted my client from his cell to the F and G corridor?

5  A.   No, sir.

6  Q.   Officer Hennig, let me show you what's been marked as

7  Plaintiff's Exhibit 22 for identification, and ask if this is

8  a employee accident injury report, a report signed by you.  Is

9  that document your document, signed by you?

10  A.   Yes.

11            MR. DIEDERICH:  Your Honor, I request this be

12  admitted into evidence.

13            MR. TURKLE:  No objection.

14            THE COURT:  This is Exhibit 22 now?

15            MR. DIEDERICH:  Correct.

16            THE COURT:  Okay.  Received.

17            (Plaintiff's Exhibit 22 received in evidence)

18  Q.   Officer Hennig, on this report, did you write the

19  words, "struck to left side of face by Inmate Anderson,

20  Jerome"?

21  A.   Yes, sir.

22  Q.   Could you state for the jury your approximate salary with

23  the State of New York?

24            MS. COLLINS:  Objection.

25            THE COURT:  Sustained.  I don't know how that's

Snedeker-direct-Diederich

1          THE COURT:  Okay.

2   Q.   And did you contribute to the preparation of this

3   document?

4   A.   No, I did not.

5   Q.   On April 11th, 2015, did you supervise the escort of

6   Inmate Anderson from the F and G corridor to the S-H-U,

7   otherwise known as SHU?

8   A.   No, I did not supervise the escort.

9   Q.   Were you the escorting officer?

10  A.   Yes, I was.

11  Q.   Okay.  And, and the escort was completed without

12  incident?

13  A.   Yes, it was.

14  Q.   So there was no injuries -- withdrawn, withdrawn.

15          What is the S-H-U, or SHU, the Special Housing Unit?

16  A.   Just what it -- it's a Special Housing Unit where inmates

17  are sent there or placed there under disciplinary sanctions.

18  Q.   Okay.  And is it a form of punishment to be sent there?

19  A.   A slight punishment, yeah.

20  Q.   And how is -- in what way is it punishment to be sent to

21  the S-H-U?

22  A.   Because the inmates are segregated from the rest of the

23  jail population.

24  Q.   Are they, for example, placed in solitary confinement?

25  A.   I didn't hear what you said.  I'm sorry.

Snedeker-direct-Diederich

1   Q.   Are they placed in solitary confinement?

2   A.   No.  They're not solitary confined, no.

3   Q.   Are some of them in solitary confinement?

4   A.   They're single cells, yes.

5   Q.   And when a person is sent to the SHU for disciplinary

6   punishment, what is the restriction upon their daily lives?

7   A.   Well, they don't interact --

8   Q.   If you can, if you can explain that to the jury.

9   A.   They don't interact with general population.  They have

10  to stay in that one cell, other than going to recreation.

11  Q.   I'm sorry, sir.  I didn't hear.

12  A.   They stay in that cell, other than going to rec.  They

13  have a one-hour rec a day.  They don't go to programs.  They

14  stay on that one unit.

15  Q.   Are they allowed to use, for example, the library at

16  the --

17  A.   Library is afforded.  It's given to them.  They don't go

18  to the library.  But there's a library cart that goes around.

19  Q.   Let me show you what's been marked Plaintiff's 15 for

20  identification.  I'd ask you if you recognize this document.

21  A.   Yes, I do.

22  Q.   Is that your signature at the bottom of the page?

23  A.   Yes, it is.

24          MR. DIEDERICH:  Your Honor, I request this be

25  admitted into evidence.

Sue Ghorayeb,  Official Court Reporter

Snedeker-direct-Diederich

1          MS. COLLINS:  No objection, Your Honor.

2          THE COURT:  15 is received.

3          (Plaintiff's Exhibit 15 received in evidence)

4          MR. DIEDERICH:  Your Honor, Your Honor, I have

5    nothing more for this officer.

6          THE COURT:  Any cross?

7          MS. COLLINS:  No, Your Honor, but we would reserve

8    our right to recall him at a later time.

9          THE COURT:  Okay.  Fair enough.

10         Okay.  Officer, you can step down, but you may be

11   back.  All right?

12         THE WITNESS:  Thank you, Your Honor.

13         THE COURT:  Okay.  With that, ladies and

14   gentlemen -- I told you we'd work until 4:30, and it's 4:30.

15   So, I'm going to let you go for the day.  You've had a long

16   day, but you've been terrific.  You've been attentive.  And we

17   are moving right along.  So, please have a safe ride home.

18   The weather is kind of crummy out, but at least it's not

19   snowing or sleeting or anything like that.

20         We will see you tomorrow morning.  Sometimes I have

21   other matters that I have to -- with other lawyers that I

22   have to, I have to handle before court, but tomorrow morning

23   I don't, so that's good.  So, please be here by 9:15 so that

24   we're ready to go by 9:30.  And, remember, tomorrow I'm going

25   to let you out a little earlier than normal because I have an

Osborne-direct-Diederich

1    Hennig found two white pills that were later identified by

2    Nurse Lankanti as 600 milligrams of Neurontin, which was not

3    his prescribed medication, in Inmate Anderson's right front

4    pant pocket."  That's your statement, correct?

5    A.    Correct.

6    Q.    "I, Sergeant Osborne, was then notified and reported

7    immediately."  That's your statement, correct?

8    A.    Correct.

9    Q.    And do you remember where you reported from?

10   A.    No, I don't recall.

11   Q.    Do you know when Nurse Lankanti identified the pills as

12   Neurontin?

13   A.    It was shortly after the incident, when myself and the

14   two officers went to medical to be assessed for our injuries.

15   Q.    Okay.  And how were the pills shown to Nurse Lankanti?

16   A.    Officer Hennig had them inside of a blue glove, I believe

17   it was.

18   Q.    I'm sorry?

19   A.    He had them inside a -- we use gloves to pat frisk.  And

20   when the pills were found, he would hold them inside the

21   glove.

22   Q.    Okay.  And then -- so, he showed -- he or you, or both of

23   you, showed Ms. Lankanti the two pills?

24   A.    He did, yes.

25   Q.    And she had identified them as Neurontin?

Osborne-direct-Diederich

1   A.   Correct.

2   Q.   And did she explain to both of you what the drug

3   Neurontin is?

4   A.   No.  She did not.

5   Q.   Did she indicate to you whether it is a narcotic?

6   A.   No, she did not.

7   Q.   Did she indicate to either of you whether it's a

8   controlled substance?

9   A.   No, she did not.

10  Q.   Did either of you know at that time whether Neurontin is

11  either a narcotic or a controlled substance?

12  A.   The only thing I knew about Neurontin at that time is it

13  is a one-on-one medication that's taken at a window in front

14  of a nurse or pharmacist, and is to be taken there in front of

15  them.  It's not a self-carry medication.

16  Q.   Do you know whether or not it's a pain medication?

17  A.   I don't know.

18  Q.   From your experience, do inmates deal in Neurontin?

19  A.   Yes.

20  Q.   And, therefore, you find Neurontin occasionally on the

21  premises; is that correct?

22  A.   That is correct.

23  Q.   So, after this -- these two pills were examined by Nurse

24  Lankanti, were the pills then returned to Officer Hennig?

25  A.   I don't recall.

Osborne-Cross-Collins

1    vulnerable areas.

2    Q.    I believe you testified you went to the academy; is that

3    correct?

4    A.    Correct.

5    Q.    And what sort of trainings did you receive at the

6    academy.

7    A.    Again, I've learned report writing, chemical agents, use

8    of force, first aid.  We had some legal courses, weapons,

9    training.  I might be missing a few.  There was a lot going

10   on, but --

11   Q.    And what, if any, other training have you received from

12   DOCCS since that time?

13   A.    Well, we receive training annually.

14   Q.    Does that include use of force training?

15   A.    It does.

16   Q.    Back in 2015, what were your job responsibilities as a

17   sergeant, in general?

18   A.    In general, I may to supervise staff, of course,

19   supervise inmates.  In general, to supervise staff, supervise

20   inmates, make sure inmates are complying with staff direction.

21   If there's any problems in any specific area, I am -- I

22   respond to the area or, you know, take control of the

23   situation at that point.

24   Q.    And obviously we know that you were working on April 11th

25   of 2015.  Talk -- why don't you tell me what happened at

1  around 7 o'clock p.m. that evening?

2  A.    Okay.  I was notified via radio -- that would be by radio

3  from another officer -- asking me to report to the F and G

4  corridor.  When I reported to the corridor, the door that I

5  came through would be the mess hall door, the fastest way to

6  the building at that time.  When I came in, Inmate Anderson

7  was on the wall to my left, Officer Hennig directly behind him

8  and Ernst off to his right.  Officer Hennig approached me and

9  showed me the two pills that he found during the pat frisk on

10  Inmate Anderson.  He told me they brought Inmate Anderson out

11  of the yard because he was wearing too many layers and acting

12  suspicious.

13        At that time, I walked over to the officer where --

14  where the inmate was, and I told Inmate Anderson to take his

15  hands off the wall because he was still in the pat frisk

16  position when I got there, and I told him to step up to the

17  wall where he was still facing the wall.  I asked the inmate

18  whose pills they were, what pills they were, where he got

19  them.  The inmate refused to answer any of my questions, which

20  is no big deal.  I mean, it -- you know, none of them ever

21  really tell on themselves, so it wasn't odd.  At that time, I

22  advised the inmate that these officers are gonna go back and

23  search his cell.

24        Inmate, you know, began slaying on the wall,

25  breathing a little heavy, and he said, "Fuck that, nobody is

Osborne-Cross-Collins

1  going in my cell."

2       I said, "No, it's routine.  These officers will be

3  searching your cell."

4       He said, "Fuck that, Sergeant."  He turned around

5  and punched me right in my face.

6       Officer Hennig at that time kind of pushed me out of

7  the way and then took two hits to his face, where Ernst got

8  him in an upper body hold, bear hold hug kind of grip, forcing

9  him into the wall.  Hennig, you know, grabbed his upper body

10  too trying to help him.  And at that time, the only thing

11  exposed was his legs.  I grabbed both legs from him and pulled

12  them out.  The inmate and the officers fell on a bench that

13  was in the area and then eventually to the floor.

14  Q.  Okay.  Now, Sergeant Osborne, let's break that down a

15  little bit.

16       You testified you entered the area known as the F

17  and G corridor, correct?

18  A.  Correct.

19  Q.  Turning your attention to Defendants' exhibit binder

20  that's in front of you right there, there is a tab in there --

21  well, actually, the -- in the front of the binder is an

22  envelope and it's marked Exhibit M-1.

23       For the record, Plaintiff's counsel and the Court

24  have been provided copies of this exhibit under the Tab M

25  that's enumerated M-1 for identification.

Sue Ghorayeb,  Official Court Reporter

 1              THE WITNESS:  It's the approximate area.  I'm not

 2    sure if he was on the right side of the window or the left

 3    side of the window on this.

 4              MS. COLLINS:  Permission to publish my copy of this

 5    exhibit to the jury, Your Honor.

 6              THE COURT:  Sure.

 7              MR. DIEDERICH:  Your Honor, could I just ask that

 8    the witness clarify if he meant the right side of the picture,

 9    us looking at it, or if he meant from the -- a person sitting

10    on the chair, it would be on the right.

11              THE COURT:  It wasn't unclear to me.  If I'm looking

12    at the picture, obviously, the right side means the right side

13    of the picture.  It doesn't mean the left side of the picture.

14    How could it mean that?  Unless that's what you meant.  Did

15    you mean the left side rather than the right side?

16              THE WITNESS:  No, sir.

17              THE COURT:  So I'm looking at the picture, on the

18    right side of the picture.

19              THE WITNESS:  The right side of the picture.

20              THE COURT:  Got it.  Next question.

21    Q.   And when you approach -- what happened after you arrived

22    at F and G corridor, Sergeant Osborne?

23    A.   Again, this inmate was in the pat frisk position on that

24    wall.

25    Q.   And did you approach that area?

Osborne-Cross-Collins

1   A.   I did.

2   Q.   And what happened next?

3   A.   I told the inmate that he can take his hands off the wall

4   and step up to the wall.

5   Q.   And where was Officer Hennig?

6   A.   Officer Hennig at that time was standing behind the

7   inmate.

8   Q.   And where was Officer Ernst?

9   A.   Ernst was off to the right side of the inmate.

10  Q.   Okay, I believe you testified you questioned Mr. Anderson

11  about the drugs that were found on him, correct?

12  A.   I did.

13  Q.   And when you questioned him, where were you?

14  A.   I would be on Inmate Anderson's left side.

15  Q.   Is that depicted in Defendants' Exhibit M-9?

16  A.   I'm sorry?

17  Q.   Is that area depicted in Defendants' Exhibit M-9?

18  A.   Yes.  He was on that -- that -- that wall on that side

19  and I was to the left of the inmate.

20  Q.   So same general --

21  A.   Same general area.

22  Q.   Okay.  What was Mr. Anderson doing when you were

23  questioning him about the drugs that were found on him?

24  A.   He was just kind of swaying back and forth on the wall a

25  little bit, looking up, not giving me any responses.

Osborne-Cross-Collins

1   Q.   And why were you questioning him about the drugs that

2   were found on him?

3   A.   Again, it's contraband.   It's -- it's normal procedure to

4   question, ask what it is, why they have it, where they got it.

5   Q.   What was your goal in asking those sort of questions?

6   A.   Again, I wanted to know, you know, is he taking them?  Is

7   he selling them?  Did he buy them from somebody?  If he bought

8   them from somebody, we want to know who, if he would give that

9   kind of information up.

10  Q.   And why would that be a concern?

11  A.   Well, contraband is a concern throughout the prison.  I

12  mean, you know, it's -- contraband is so general statement,

13  but it's weapons, it's drugs.  But inmates that are taking

14  drugs that are not prescribed to them can have adverse effect

15  on what it does to them.  They mix drugs all the time to get

16  high, to -- you know, what we call a fix.  So, again, you know

17  I just want to know where the drugs came from, whose were

18  they, were they prescribed to him.  If they were prescribed to

19  him, it's kind of -- it's kind of minor.  It's his drug.  It's

20  prescribed to him.  It's not a -- it's a big deal, but it's

21  not huge.  He's -- he has his like, you know, whatever it is,

22  prescription, whatever.

23  Q.   What was Mr. Anderson's reaction when you were

24  questioning him about where he got these drugs?

25           MR. DIEDERICH:  Objection.  It's leading.  And I

Osborne-Cross-Collins

```
 1   think --
 2            THE COURT:  No, it wasn't.  What was his reaction.
 3   That's not a leading question.
 4            MR. DIEDERICH:  No.
 5   A.   Again, he didn't have much --
 6            THE COURT:  Sorry, wait, wait.
 7            What's the basis of your objection?
 8            The question is, what was mister react --
 9   Mr. Anders' react -- Anderson's reaction when you were
10   questioning him about where he got these drugs.  That's not
11   leading.
12            MR. DIEDERICH:  Assumes a fact not in evidence that
13   he got the drugs, but --
14            THE COURT:  Well, he just testified that -- that
15   Hennig found these pills on him.  All right.  Ask --
16            MR. DIEDERICH:  Withdrawn.  Withdrawn.  I withdraw
17   it.
18            THE COURT:  Rephrase your question.
19            MS. COLLINS:  Yes, Your Honor.
20   Q.   What, if anything, did Officers Ernst and Hennig inform
21   you about what had happened with Mr. Os -- with Mr. Anderson
22   when you arrived in the area?
23   A.   They explained to me that they pulled him out of the
24   yard, that he was acting suspicious, and upon approaching him,
25   he seemed already that he had on too many layers of clothing,
```

Sue Ghorayeb,  Official Court Reporter

1    again, which as I said is a violation in and of itself.

2    Q.   And what did they tell you they did next?

3    A.   Well, when they took him in from the yard, Officer Hennig

4    at that point performed a pat frisk on Inmate Anderson.

5    Q.   And what was recovered as a result of this pat frisk?

6    A.   There was two at that time white unidentified pills in

7    his right front pocket.

8    Q.   And you questioned Mr. Anderson about those two white

9    front -- pills found in the front of his pocket, correct?

10   A.   Yes.

11        MR. DIEDERICH:  Your Honor, the -- counsel is

12   leading the witness.

13        THE COURT:  The last question is leading, but I'm

14   going to allow it.

15        Next question.  Let's go.  Come on.

16   Q.   How hard did Mr. Anderson punch you?

17   A.   Very hard.

18   Q.   And where did he punch you?

19   A.   In my face on the side.

20   Q.   How did he punch you?  What did he use?

21   A.   A closed fist.

22   Q.   What, if anything, did you think at that moment that

23   Mr. Anderson punched you in the face?

24   A.   Well, I mean, I was, you know, shocked and stunned a

25   little bit, but at that time, it was just, you know, making

1   sure that I didn't get punched again and nobody else did.

2   Q.   What happened after Mr. Anderson punched you in the face?

3   A.   Officer Hennig kind of pushed me out of the way 'cause he

4   was still, you know, in a fighting stance, receiving two

5   punches to his face by doing so.  And again, like I said,

6   Officer Ernst grabbed him in an upper body hold, you know,

7   locking both arms and getting him in like a bear hug-type hold

8   is the best I can describe it.  Officer Hennig helped him with

9   the upper body, drove the inmate into the wall.  At that time

10  his legs were exposed.  I grabbed both legs from him and tried

11  to pull them out so we can get him onto the ground.

12  Q.   Is grabbing Mr. Anderson a type of training or technique

13  that officers are trained in in the use of force?

14  A.   Yes, it is.

15  Q.   What about -- why did you pull his legs out from under

16  him?

17  A.   Well, that's also training we get.  It's -- that's the

18  training that we receive also in the academy.  It's called the

19  front dump, I believe.

20  Q.   And what is your objective in performing these maneuvers?

21  A.   Again, to get the inmate on the ground where we have

22  better control.

23  Q.   And why would you have better control of him on the

24  ground?

25  A.   It's hard to punch when you're on the ground.  You can't

1    strike, you know, with two of us on him on the ground or at

2    that point, three.  It's easier to control all his limbs.

3    Q.   Referring to Defendants' Exhibit M-9, Sergeant Osborne,

4    where were you when you pulled Mr. Anderson's legs out from

5    under him?

6    A.   I was kind of in this area right here by the -- by the

7    blackboard, by the corner of the bench.

8    Q.   Next to the bench?

9    A.   Next to the bench, correct.

10   Q.   What is that bench made of, Sergeant Osborne?

11   A.   I don't recall, but it's a solid Material.

12   Q.   Were there any pillows on it back in April of 2015?

13   A.   No.

14   Q.   Were there any cushions on it back in April of 2015?

15   A.   No.

16   Q.   What is the ground of that corridor made of?

17   A.   Concrete.

18   Q.   What was Mr. Anderson doing while you officers were

19   attempting to restrain him?

20   A.   He was -- he was fighting back.  He was struggling.

21   Q.   And how was he struggling?

22   A.   He refused to give his arms up for handcuffs after

23   multiple direction from me and the officers during the course

24   of this.  He would not -- he would not comply at all.  He was

25   trying to hold his hands in front of him so we don't get the

1    cuffs on and trying to still push off the -- at one point, we

2    fell onto the bench.  Trying to push off that to get back on

3    his feet and then eventually made it to the floor and, again,

4    still struggling.

5    Q.    But there came a time when he was restrained, correct?

6    A.    Correct.

7    Q.    How did you get Mr. Anderson restrained?

8    A.    Officer Ernst took control of one arm, Officer Hennig

9    took -- took control of the other, kind of forcing his hands

10   behind his back.  Once he was close enough to get the cuffs

11   on, then I applied the handcuffs to him.

12   Q.    And when, if any, other officers responded to this area?

13   A.    Shortly after.  We had the inmate in cuffs already.

14   Q.    Going back to the floor, Sergeant Osborne, you testified

15   it was made of concrete.  Were there any rugs on the floor

16   back in April of 2015?

17   A.    No.

18   Q.    When other officers responded, how did they -- how did

19   they know how to get there?

20   A.    I'm sorry?

21   Q.    How did the responding officers know they had to go to

22   the F and G corridor?

23   A.    There was an officer that's in that control booth that

24   cannot leave.  I believe he's -- he activated the -- the alarm

25   system call for response to the area.

Osborne-Cross-Collins

1   Q.   I'll refer you to Defendants' Exhibit M-3.  You mentioned

2   the control booth.  Is -- where in this picture, if anywhere,

3   is that control booth?

4   A.   This the control.

5   Q.   So there was an officer in there and he probably made a

6   response?

7   A.   Correct.

8   Q.   Okay.  Who, if anyone, responded to your area?

9   A.   I don't recall.

10  Q.   Why was a response called?

11  A.   We were struggling with an inmate and it's procedure.

12  Q.   What, if any, injuries did you observe on Mr. Anderson?

13  A.   I didn't observe any.

14  Q.   What, if any, injuries did Mr. Anderson complain to you

15  he had?

16  A.   He didn't complain to me about any.

17  Q.   Sergeant Osborne, how long -- from the time Mr. Anderson

18  punched you in the face until the time that he was restrained

19  in handcuffs, how long of a period of time was that?

20  A.   It felt like five minutes, but in reality, probably less

21  than a minute.

22          MS. COLLINS:  One moment, Your Honor.

23          THE COURT:  Okay.

24  Q.   Sergeant Osborne, when, if ever, are inmates permitted to

25  carry Neurontin in their pockets?

Osborne-Cross-Collins

1   A.    Never.

2   Q.    Why?

3   A.    Again, it's a -- it's a one-on-one medication that's

4   supposed to be taken at the clinic in front of a nurse or

5   pharmacist.

6   Q.    What, if any, concerns does DOCCS have with respect to

7   inmates carrying medication like Neurontin or other drugs

8   around in their pockets?

9   A.    It's a major concern.  Again, it's a -- you know, it --

10   ultimately, it's some form of drug and we don't know the

11   effects it has on everybody, and we don't want inmates high or

12   under any kind of influence that can make them act crazy or

13   unpredictable.

14   Q.    After Mr. -- after Mr. Anderson was finally restrained,

15   what did you do?

16   A.    I took the two officers, Hennig and Ernst, and reported

17   to the medical area.

18   Q.    Is that standard operating procedure following the use of

19   force?

20   A.    Yes, it is.

21   Q.    Were you in fact injured?

22   A.    Yes I was.

23   Q.    What injuries did you have?

24   A.    I had swelling and bruising to the left side of my face.

25          MS. COLLINS:  One moment, please.

Sue Ghorayeb,  Official Court Reporter

Osborne-Cross-Collins

1  Q.   Sergeant Osborne, now referring your attention to
2  Plaintiff's exhibit binder up there, to Plaintiff's Exhibit 20
3  that's in evidence.  Please let me know when you've found it.
4  A.   I found it.
5  Q.   Sergeant Osborne, what injuries -- Sergeant Osborne, what
6  is this document?
7  A.   This is a employee incident injury report.
8  Q.   And does it in fact contain information about injuries
9  that you received on April 11th, 2015?
10 A.   Correct.
11 Q.   And what injuries does it say that you received?
12 A.   It says left eye, left cheek bruising and swelling noted.
13 Q.   Did you receive any treatment following this?
14 A.   Yes, I did.
15 Q.   And what did you receive?
16 A.   Ice and I believe some Advil or a form of.
17 Q.   Sergeant Osborne, did you know Mr. Anderson before
18 April 11th, 2015?
19 A.   No, I did not.
20 Q.   When, if ever, did you assault Mr. Anderson?
21 A.   I never assaulted him.
22 Q.   When, if ever, did you kick Mr. Anderson?
23 A.   Never.
24 Q.   When, if ever, did you punch Mr. Anderson?
25 A.   Never.

Anderson—direct—Diederich

1  Q.   Okay.  Thank you.  I'd like you to briefly describe for

2  the jury your background beginning with your childhood.  Where

3  were you born?

4  A.   Well, I was born in Buffalo, New York.  My roots is --

5  are down South, Alabama.  I moved to Alabama at the age of

6  ten, which is where my mother is at.  I went to school there.

7  I was practically raised in Alabama and never had -- I never

8  completed high school.

9  Q.   Okay.  As to high -- as to high school, why didn't you

10  complete high school?  Before I ask that, did you have any

11  problems in high school?

12  A.   Problems, no.

13  Q.   Okay.

14  A.   Well, I got -- I got into an incident, one particular

15  incident that led me to a youth facility.

16  Q.   Okay.

17  A.   Caught smoking marijuana in high school, and that led to

18  me going to a youth facility, and me being young and I guess

19  you can say dumb, I ran.  I made a quick decision.  I escaped.

20  Q.   And what happened as a result of escaping?

21  A.   I went to another -- I guess you can say boys detention,

22  a higher --

23  Q.   A reform school?

24  A.   More of maximum but not like an adult jail.

25  Q.   A maximum --

Sue Ghorayeb,  Official Court Reporter

1    experienced the chain gang.  I've experienced assaults.

2    Q.    And was there a thing called a Mexican Jail?

3    A.    Oh, yeah.  The Mexican Jail, I've also experienced that a

4    couple of times.

5    Q.    And what is that?

6    A.    A Mexican Jail is basically like a cage with a lock on it

7    and it is designed -- it has rocks, we call that C-Building,

8    it's halfway inside the cement and half of it sticking up.

9    Its purpose is for you not to be able to sit down, you know,

10   or to get comfortable at all, you know.  It's like a caging

11   and you're standing for hours at a time and you're not able --

12   you know, just a bunch of rocks sticking outside the ground.

13   Q.    So, as a result of your experience there at Draper, what

14   did you do?

15   A.    I, again, made a bad decision and I decided -- well,

16   actually, at first, I tried to see a psychiatrist -- I mean a

17   psychologist, because I was actually having thoughts of

18   suicide, and I eventually ran again.

19   Q.    And how did you do that?

20   A.    I ran.  I hid in the back of a garbage truck.

21            I hid in the back of a garbage truck.

22   Q.    So you escaped?

23   A.    Yes.  So I escaped.

24   Q.    And what happened next?

25   A.    We got caught.  Me and there was another guy with me.  We

Anderson-direct-Diederich

1    couldn't understand that.  I was -- I really felt some kind of

2    way about that.  So again --

3    Q.    How did you feel -- how did you feel as a result of being

4    turned down on parole?

5    A.    You know, I was flabbergasted actually.  I was, I was, I

6    was hurt and disappointed, because, you know, I had met a

7    really nice female.  I had, I had to get -- maintain

8    employment.  My family will support me.  You know, to me, I

9    did everything that was required, which is -- I never said

10   it's minor.  I know the state, you don't care for that.  I

11   understand that being considered, you know, major in some

12   cases, but there was no harm intended, no harm done.  I did

13   two years, and then for me to do this, and I'm seeing -- the

14   main thing, I'm seeing other guys who come in with other cases

15   worse than mine's, it's far worse than mine's; parole

16   violation more, more than once, yet, they still made parole,

17   and yet here I am in the system and I can't make parole.

18   Q.    Okay.

19   A.    I mean, I wasn't even, you know, being reinstated and

20   I've done everything that was required of me.

21   Q.    So, after you were turned down for reinstatement of

22   parole after the two years, after you were turned down, what

23   did you do next?

24   A.    Well, again, I did a -- long story short, I really made a

25   mistake.  Because I was in a parole violation, so I had

Sue Ghorayeb,  Official Court Reporter

Anderson-direct-Diederich

1    outside clearance, and then long story short, a train came by

2    and I jumped on it and here I am.

3    Q.   At that time, you were in a minimum security prison?

4    A.   Yes, medium.  Not minimum, medium.

5    Q.   Okay.  So, you jumped on the train and escaped; is that

6    correct?

7    A.   Yes.

8    Q.   What happened, what happened next?

9    A.   Well, first of all, I like to say that was the dumbest

10   decision I ever made in my life, one of them.

11          What happened next?  I came to New York.

12   Q.   And how did you get to New York?

13          You were in prison garb?

14   A.   No.  Well, when I escaped, I had stole some clothes.

15   There was some clothes on a clothesline in a particular part

16   of -- what was that?  No.  This is in Tuskegee, Alabama.

17          I stole some clothes off a clothesline, basically,

18   to change off my prison garb.  And then I had some money wired

19   and then I got on a bus and then I ended up in Brooklyn.

20   Q.   Okay.  Now, describe what happened there?

21   A.   Well, while in Brooklyn, I was working.  I finally worked

22   for -- you know, I never had a problem working.  I finally

23   worked for a couple of weeks like doing off -- under-the-table

24   work, you know, off-the-books, but then that ran out, and it

25   was then in like February, it was kinda still cold, and I was

Sue Ghorayeb,  Official Court Reporter

1   didn't say anything to me that day.  So, anyway, after the OSI

2   guy interviewed me and I finished my business there, I went to

3   my cell.

4           So, approximately two weeks later, Officer Hennig

5   came to my cell and told me that Sergeant Osborne -- he

6   didn't -- he didn't call his name.  He told me Sergeant wanted

7   to interview me.  Approximately two weeks later, Officer

8   Hennig came to my cell and told me Sergeant wanted to

9   interview me.

10  Q.   Okay.  Before getting into that, could you explain to the

11  jury what your status was in the prison in the days prior to

12  and leading up to and including April 11th, 2015?

13  A.   Well, I was on loss of -- I was on loss of rec, which

14  mean I wasn't allowed to go outside for a minor infraction.

15  Q.   And there's documents to corroborate that, correct?

16  A.   Pardon me?

17  Q.   There's documents that corroborate that you had --

18  A.   Yes.

19  Q.   -- loss of rec?

20  A.   Yes, yes.

21  Q.   And that means you could not go outside to recreate?

22  A.   Right.  Actually, I'm not allowed to go outside under no

23  circumstances with regular population.  Under no circumstances

24  am I allowed to be outside.

25  Q.   And you were on that status on April 11th, 2015?

Anderson-direct-Diederich

1   A.   Yes, I was.

2   Q.   So, you were in loss of rec status on April 11th, 2015,

3   correct?

4   A.   Yes.

5   Q.   Okay.  Could you please continue regarding what Officer

6   Hennig told you when he arrived at your cell on April 11th,

7   2015?

8   A.   Right.  Approximately 6:30, maybe 7:00 o'clock, Officer

9   Hennig arrived at the front of my cell, told me that Sergeant

10  Osborne -- or he didn't say the name.  He said Sergeant wanted

11  to interview me.  So, I got dressed and I complied.  I

12  walked -- I mean, Officer Hennig and I walked down the hall to

13  where I was at, E block, to the F and G corridor.  Once we got

14  to the F and G corridor, Sergeant Osborne was there awaiting

15  us.

16        So, we went to the side of the -- you know, the F

17  and G corridor, we went to the side.  And Sergeant Osborne

18  asked me, asked me what is this, you know, what I had to say

19  to the OSI guy about any of the Sergeants.  So I told

20  Sergeant, I don't -- I do not wish to talk, I do not wish to

21  discuss that at this time, you know, I do not wish to discuss

22  this with you.  Because I didn't have to discuss this with

23  you.

24        So, Sergeant Osborne did ask me to put my hands on

25  the wall.  As soon as I put my hands on the wall, he punched

Anderson—direct—Diederich

1    me.  Sergeant Osborne punched me in my face.  Officer Hennig

2    and Officer Ernst was -- you know, as soon as they punched me,

3    they got me off the wall, then they proceeded to beat me and

4    push me, you know, beat me on the floor, kick me, stomp me,

5    push my face to the floor.  And other officers came after

6    that.  You know, other officers came and joined the beating.

7    I mean, that's basically.

8    Q.   That you were eventually subdued?

9    A.   And then after I was handcuffed and all that, then I was,

10   I was handcuffed and I was led to the SHU by Officer, by

11   Officer Freeman and Officer Morel and Sergeant Carter.

12   Q.   And as to Sergeant -- as to Officer Freeman and Morel, do

13   you see them in the courtroom today?

14   A.   Yes.

15   Q.   And do you know them?

16   A.   Do I know them?

17   Q.   Yes.

18   A.   Only from, you know, from the incident.

19   Q.   Okay.  And what, if anything, did they do regarding you

20   when they moved you to the SHU?

21   A.   They removed my sneakers, took my glasses and threw them

22   away.  And while I was on my way to the SHU, Officer Freeman

23   was on one side of me, Officer Morel was on the other side of

24   me.  They -- pardon me.  They stomped my feet.  You know,

25   every chance they got, they stomped my feet.  They poking me

Sue Ghorayeb,  Official Court Reporter

Anderson—direct—Diederich

1   with the baton, you know, elbowing me, punching me in my head,

2   you know, all this type of stuff right here.  They did all of

3   this until we got to the SHU.  Once we got to SHU, you know,

4   they got cameras there, then everything stopped.

5   Q.   And what happened next?

6   A.   Well, over in the SHU, they took me in.  They took

7   pictures of my injuries and gave me a jumpsuit and sent me to

8   the infirmary.

9   Q.   And, by the way, what were your injuries at that --

10  A.   On injuries, well, I had been -- the officers had like

11  beat me in one particular spot on my thigh.  It seemed like

12  it -- I don't know, maybe two or three minutes.  But it was

13  extremely pain.  It was like -- it was designed to, to produce

14  more pain and less injury -- I mean more injury, less scarring

15  or whatever.

16          But, anyway, I was dealing with what they call the

17  femur was injured.  My toes.  My wrists.  You know, my arms

18  was out of socket because I was handcuffed behind my back.  My

19  wrists was like almost like lacerated because they was

20  twisting the cuffs on me, tightening them up as we was

21  walking.  And we had -- like I say, they was poking me with

22  the batons and punching me and elbowing and all that.

23          So, they took pictures of all that, you know, my

24  femur, my toes, my back and my wrist, and probably other

25  places I don't recall.

Anderson—direct—Diederich

1    Q.   Okay.

2              MR. DIEDERICH:  Your Honor, I would like to show the

3    witness some of the Defendants' exhibits, photographs.

4              THE COURT:  Sure.

5    Q.   I'm going to show you what's been previously marked

6    Defendants' Exhibit B.  B1.  B1 for identification.

7              THE COURT:  Okay.  Is this just one, one item, or

8    multiple items?

9              MR. DIEDERICH:  It's several photographs, Your

10   Honor.

11             THE COURT:  But collectively they're marked as B1;

12   is that what you're saying?

13             MR. DIEDERICH:  Yes, Your Honor.

14             THE COURT:  Okay.  For identification.

15   A.   Well --

16             THE COURT:  Ask your next question, sir.

17   Q.   Do you recognize those photographs?

18   A.   Yes.

19   Q.   Have you ever seen those originals?

20   A.   Originals?

21   Q.   Yes.

22   A.   What do you mean by originals?

23   Q.   The original photographs.

24   A.   Yes.

25   Q.   You've seen those photographs before?

Anderson—direct—Diederich

1  A.    Yes.

2  Q.    And do they show your injuries on, on April -- sustained

3  on April 11th, 2015?

4  A.    They show some, some of them, most of them.

5  Q.    And could you explain, explain to the jury what those

6  photographs either show or do not show?

7  A.    Well, they don't show the injuries, you know, on my head.

8  Well -- and I received on my back.  But I do see -- I don't

9  know if these are lumps or just me getting fat.  I'm hoping

10  the jury would like to see this.  And some of them that I do

11  see is -- I see bruises, bruises on my -- on the back, on the

12  side of my back.  I see the prints from the handcuffs, when

13  they was twisting that.  They specifically took pictures of

14  that.  My femur.  I see that swollen.

15  Q.    That meaning your thigh?

16  A.    The femur.

17  Q.    Your thigh?

18  A.    Yes.  I maybe said it wrong.  My feet, you'll see where

19  they, you know, they stomp my feet.  Again, my thigh swollen,

20  excruciating pain right here.  Some scars on my shoulder,

21  scratches and scars, whatever.

22  Q.    Thank you.

23         MR. DIEDERICH:  Your Honor, I request this be

24  admitted into evidence.

25         THE COURT:  Can I just see it?

Sue Ghorayeb,  Official Court Reporter

Anderson—direct—Diederich

1              Okay.  So, collectively -- I don't know how many

2    there are in here, but -- well, maybe I should count.  I

3    count 11 photographs collectively marked as B1.

4              Any objection?

5              MS. COLLINS:  No objection, Your Honor.

6              THE COURT:  Okay.  B1 is received.

7              (Plaintiff's Exhibit B1 received in evidence)

8              MR. DIEDERICH:  Your Honor, may I just briefly show

9    these to the jury?

10             THE COURT:  Sure.  You can use the ELMO, by the way.

11   Put one of them on the ELMO, that overhead projector type

12   thing.  It might be a better way to do it.  And you can zoom

13   in or out.  There's a button that allows you to zoom in or

14   out.  No, not moving it.  There is an actual button that

15   allows you to zoom in or out.

16             MR. DIEDERICH:  I think it's --

17             THE COURT:  All right.  That's fine.  This is part

18   of B1.  I'm not sure why it's fuzzy.

19             MR. DIEDERICH:  We're losing focus.

20             THE COURT:  Well, you're near the end, right?

21             MR. DIEDERICH:  Thank you, Your Honor.

22             THE COURT:  All right.  And, again, ladies and

23   gentlemen, you'll have Exhibit B1, along with all the other

24   exhibits that have been received in evidence, when you

25   deliberate.

1  Q.   So, please continue.  What happened next?

2  A.   You remember where I left off from?  I don't recall where

3  I left off.

4         THE COURT:  You were at the SHU.  You were examined.

5  These photographs were taken.

6         THE WITNESS:  Oh, okay.  Then -- okay.  Once I left

7  the SHU --

8  Q.   Did you go to the infirmary?

9  A.   Yeah.  I was escorted again by the same two officers,

10  Morel, Officer Morel and Freeman, back to the infirmary.  And

11  I received the same treatment from SHU to the infirmary.

12  Q.   What do you mean by that?

13  A.   The same, you know, stomping on the feet, the same

14  punching and jabbing and, you know, stuff like that.

15  Q.   By Officer Morel and Officer Freeman?

16  A.   Yes.

17  Q.   And what happened next?

18  A.   Then I went to the infirmary.  I told the nurse -- I

19  informed the nurse of my injuries and told her exactly what

20  had happened again.  And she -- they waited for me to go to

21  Putnam Hospital.  She called the ambulance and sent me to the

22  hospital, Putnam Hospital.

23  Q.   Did you request to go to the Putnam Hospital, or did

24  she --

25  A.   No.

Anderson—direct—Diederich

1  Q.    —— suggest it?

2  A.    She just took it upon herself.

3  Q.    And what happened at Putnam Medical Center or Putnam

4  Hospital?

5  A.    They looked at some of my injuries.  And I received an

6  x—ray of my, my thigh, and I received an injection of some

7  form of pain pill.  And ice, I think.  Something like that.  I

8  may have received an x—ray in a —— you know, more than my

9  thigh.  I think it may have been my back also.

10  Q.    I'm going to direct your attention to Plaintiff's Exhibit

11  27A, and ask if you recognize the document.

12        MS. COLLINS:  For the record, Your Honor, could

13  Plaintiff's counsel identify what numbers are on the bottom of

14  the pages.

15        MR. DIEDERICH:  27A is 230—238.  I'm handing up the

16  pages, Your Honor.

17        THE COURT:  Looks like it's Anderson Med 224

18  through ——

19        MR. DIEDERICH:  No, 238 and 239.

20        THE COURT:  Okay.  Well, that's different from

21  what's in my binder.  All right.  Anyway, this is 27A?

22        MR. DIEDERICH:  Yes, Your Honor.  27A is select

23  pages from 27B, which is a larger exhibit that has more ——

24        THE COURT:  Okay.  What are the page numbers, 224

25  through 239?

Anderson-direct-Diederich

1              MR. DIEDERICH:  No, no.  27A, Your Honor, is 238 and

2    239.

3              THE COURT:  Oh, just two pages.  All right.

4              MR. DIEDERICH:  It should be before Tab 27 in the

5    binder.

6              THE COURT:  No, they're after it.  But, anyway, 27A

7    is Pages --

8              MR. DIEDERICH:  And it's in that 238 and 239.

9              THE COURT:  Got it.

10             You have that, Ms. Collins?

11             MS. COLLINS:  Yes, Your Honor.

12   Q.   Mr. Anderson, do you recognize those two pages?

13   A.   Yes.

14   Q.   And what are they?

15   A.   They are my health record from Putnam Hospital, I think.

16   Q.   And take a look at the small print at the top.

17   A.   Pardon me?

18   Q.   Take a look at the small print at the top of the

19   document.

20   A.   Yeah, I can barely make it out, what it says.  But I'm

21   looking.  What do you want me to do?

22             THE COURT:  The very top, it says -- I know this is

23   not in evidence, but it says, "State of New York Department of

24   Corrections and Community Supervision" on both of these two

25   pages.  Do you see that?

Anderson-direct-Diederich

1          THE WITNESS:  Ambulatory health record progress.

2          THE COURT:  Right.

3          THE WITNESS:  Right.

4  Q.   You believe those are the infirmary notes?

5  A.   Infirmary?  Yeah.  I believe so.

6          MR. DIEDERICH:  Your Honor, I request this document

7  be admitted into evidence.

8          MS. COLLINS:  No objections, Your Honor.

9          THE COURT:  Okay.  237A is received.  And, again,

10  that's Bates number Anderson Med 238 and 239.  Exhibit 27A.

11  Q.   And could I direct your attention, Mr. Anderson, to

12  Exhibit 26, Plaintiff's Exhibit 26, and ask if you recognize

13  those documents.

14  A.   Do I have Exhibit 26?  Oh, okay.

15  Q.   If you'd look at Tab 26.

16  A.   Putnam Hospital.  I do recognize this.

17  Q.   And what are those?

18  A.   These are like affidavit from Putnam Hospital.

19  Q.   And the pages after?

20  A.   Diagnosis.

21  Q.   Are those medical records from Putnam Hospital concerning

22  you?

23  A.   Yes.

24  Q.   Okay.

25          MR. DIEDERICH:  Your Honor, I would request Exhibit,

Anderson-direct-Diederich

1   Plaintiff's Exhibit 26 be admitted into evidence.

2            MS. COLLINS:  No objection.

3            THE COURT:  Okay.  26 is received.

4   Q.   Apart from what you just testified to, including Putnam

5   Hospital taking an x-ray, anything else you want to tell the

6   jury about your examination at Putnam Hospital?

7   A.   Well, I mean, I complained about a couple of things that

8   they never, never really looked at.

9   Q.   Did you --

10  A.   Like my head --

11  Q.   Go ahead.

12  A.   Like my head injury and my -- you know, I believe I

13  have -- up to that, I believe I received a concussion that

14  day, because the blows was solid.  But they never looked at

15  that.  That's basically it.

16  Q.   Okay.  Now, after you -- how long did you stay at Putnam

17  Hospital?

18  A.   Only a few hours.

19  Q.   Okay.  And then you returned to the Green Haven

20  Correctional Facility?

21  A.   Yes.

22  Q.   Could you describe your return to the Green Haven

23  Correctional Facility?

24  A.   Well, upon my, upon my arrival back to the facility.  I'm

25  going to be honest.  I'll say Officer Dillon -- you know, it's

Sue Ghorayeb,  Official Court Reporter

Anderson—direct—Diederich

1    been a few years, and the dude kind of looked like him, but

2    now when I saw him today and take the stand, there was some

3    doubt in my mind as far as was he actually the guy that -- it

4    was an officer.  I'm not sure if it was him.  But I had

5    alleged that soon as I stepped back inside the facility, I was

6    met with a two piece by Officer Dillon.  And I was assaulted

7    again by Officer Dillon.  And the statement was like, you want

8    to assault my Sergeant, and then he just started -- proceeded

9    to assault me.  But I want the record to reflect that I can't

10   say, though, I can sit right here and be a hundred percent

11   sure and say that that was him.

12   Q.   So, is it your testimony that a Correction Officer, a

13   Caucasian Correction Officer, who looks similar but --

14             MS. COLLINS:  Objection, Your Honor.

15             THE COURT:  You can't testify for him.  He just

16   said -- I think what you said is that when you got back from

17   the hospital, you were assaulted again by a Correction

18   Officer.  You thought it was Dillon, but now you can't be a

19   hundred percent sure it was Dillon.

20             THE WITNESS:  Now that I see him today, because

21   it -- yeah, I'll be honest.  I can't be a hundred percent

22   sure.

23             THE COURT:  You have to be honest.  You just took an

24   oath --

25             THE WITNESS:  Yeah.

Sue Ghorayeb,  Official Court Reporter

1            THE COURT:  -- to be honest.

2            THE WITNESS:  Well --

3            THE COURT:  Of course you've got to be honest.

4            THE WITNESS:  -- they all took oaths, and the oath

5    wasn't honest.

6            THE COURT:  Right.  But you're supposed to be

7    honest.  You took an oath.

8            THE WITNESS:  Yeah.

9            THE COURT:  Let's stick with you.  All right?

10           THE WITNESS:  All right.

11           THE COURT:  All right.  Let's go.  Go ahead.

12   Q.   So, it's your testimony that, as you sit here right now,

13   you're not sure whether Officer Dillon was the officer that

14   met you upon your return from Putnam Hospital?

15   A.   Right.  Not a hundred percent sure, no.

16   Q.   Thank you.

17           What happened upon your return from Putnam Hospital?

18   A.   Well, like I said, as soon as I entered the facility, it

19   was a two escort -- two escorting officers that was with me.

20   Soon as we stepped in, Officer whoever it was, John Doe, two

21   pieced me, boom, boom.  And then he proceeded to punch me, and

22   he made the statement, you want to assault my Sergeant, huh?

23           And then, you know, they called Officer Cabrera and

24   another female officer.  They came to relieve me.  Came to

25   retrieve me from Dillon, or from the escort officer, to take

Anderson-direct-Diederich

1   me to infirmary.

2           And once I got to the infirmary, I told the Sergeant

3   there -- I forgot his name.  He was there.  There was a nurse.

4   I told them of the assault that I received by Dillon, or who I

5   thought was Dillon.  And I stayed in the infirmary for a few

6   days after that, and that was that.

7           Next thing you know, when I go back to my -- when I

8   went to my cell, I received a disciplinary saying something

9   about me assaulting officers, something about pills.  Pills

10  was never an issue.  I never heard anything about pills until

11  I received that disciplinary.  So, that was made up and all

12  that, you know, so --

13  Q.   When you're referring to pills, what pills are you

14  referring to, the Neurontin pills?

15  A.   Yeah, the pills that they alleged -- that they said they

16  found on me, which was totally false.  And I never heard

17  anything about pills until I left the infirmary and went back

18  to my cell and received a disciplinary.  And when I received

19  that disciplinary, that's when I received all the false

20  charges that was just to justify what they've done to me.

21  Q.   Did you -- were you carrying on your person any pills on

22  April 11th, 2015?

23  A.   No, I was not.

24  Q.   Were you ever in the recreation yard on April 11, 2015?

25  A.   No, I was not.  That's fabricated.  That's --

Anderson-direct-Diederich

1              THE COURT:  He's already in prison.

2              MR. DIEDERICH:  And I'd like him --

3              THE COURT:  He didn't go from the street to prison.

4              MR. DIEDERICH:  Correct, Your Honor.

5              THE COURT:  He went from prison to prison.

6              Anyway, go ahead and ask your next question.

7    Q.    Could you briefly describe the difference between your

8    life as an inmate in general housing and your life as an

9    inmate in the SHU?

10   A.    In SHU, you know, I'm in -- I'm in the cell 24 -- 23

11   hours a day and one hour, one hour rec a day.  I have no

12   personal property, no phone calls.  I shower every three days

13   or so.  Some, some SHUs are different.  No commun- -- I mean,

14   no communication.  We communicate with others just maybe like

15   a neighbor or something, but no socializing with other people,

16   other prisoners.  Dirty, you know, extremely dirty, as usual,

17   as well no water.  No personal cosmetics, no personal

18   property, no radio, no TV.  You know, it's -- I mean, it's

19   just hard.  You know, just, just in there -- in the cell 23

20   hours a day with --

21   Q.    And how long were you in -- how long were you in the SHU

22   after the April 11th, 2015, incident?

23   A.    Well, I did a total of 300 days, 300 days in the SHU.

24   Q.    Did you in any way challenge that?

25   A.    Yes.

Sue Ghorayeb,  Official Court Reporter

Anderson-direct-Diederich

1          MS. COLLINS:  Objection, Your Honor.

2          THE COURT:  Didn't we address this prior to trial?

3          MR. DIEDERICH:  Withdrawn, Your Honor.

4   Q.   Could you explain next what happened -- withdrawn.

5          Could you describe for the jury the effects that the

6   assault upon you on April 11th, 2015, had upon you, both

7   physical and mental, if any.

8   A.   Well, my legs, I couldn't walk for about maybe about a

9   week, maybe two weeks or whatever.  I couldn't walk without a

10  crutch and I was -- had to lay down.  I was sore all over.  I

11  had, you know, headaches, as far as physical pain.

12          I, you know, was kind of afraid of being in that

13  particular facility for a while.  You know, I didn't sleep

14  well until after I left that particular facility, because a

15  lot of the officers was still coming to the SHU area where I'm

16  at for other reasons, whatever, and each time they came, there

17  was always something said, you know, or, you know, being

18  sarcastic or whatever.

19          But for the most part, it was -- you know, it was

20  painful, my legs, my wrist, and my feet.  I couldn't put shoes

21  on for, for -- I had to get hospital slippers, because they

22  was swollen and sore.  And -- but, like I say, I didn't sleep

23  very well.  That's basically it.

24  Q.   And how long --

25  A.   I might have had one or two, you know, bad dreams as a

Anderson-direct-Diederich

1    result that was kinda like violent.  I don't know if -- I'm

2    not a psychologist, but I don't know if it was a result of

3    what happened.  But they were unusual dreams.  And --

4    Q.   Okay.  Anything else that you recall?

5    A.   Pardon me?

6    Q.   Anything else that you recall as far as effects upon you

7    as a result of the events of April 11th?

8    A.   Besides the injuries and the sleep deprivation, I can't

9    really think of anything at the moment.

10   Q.   Okay.  Thank you.

11   A.   I probably forgot.  I probably did experience some more,

12   mentioned something.  I just don't -- I can't recall right

13   now.  It's been like five years.

14   Q.   Okay.  Thank you.

15              MR. DIEDERICH:  Your Honor, I would like to show the

16   witness an exhibit.  I'm gonna give him the binder.

17              THE COURT:  Sure.

18              MR. DIEDERICH:  And direct his attention to

19   Plaintiff's Exhibit 2, for identification.  And, Your Honor, I

20   discussed this with opposing counsel.  As to Exhibit 2, we are

21   eliminating the first page of that exhibit, and the exhibit

22   will be Anderson -- Bates stamp Anderson 8 and Anderson 9.

23              THE COURT:  All right.  So, it's a two-page exhibit,

24   bearing the Bates stamps Anderson 8 and Anderson 9?

25              MR. DIEDERICH:  Correct, Your Honor.

Anderson-direct-Diederich

1          THE COURT:  All right.  We're going to call that
2   Plaintiff's Exhibit 2-A, those two pages.  You need to mark
3   them, of course, mark the pages collectively.
4   Q.   Mr. Anderson, do you recognize this document, Plaintiff's
5   Exhibit 2-A for identification?
6   A.   Yeah.  Yes, I do.
7   Q.   And do these reflect the injuries you received after the
8   events of April 11th, 2015?
9   A.   Well, most of them -- like I said, all the injuries that
10  I reported wasn't, wasn't documented.
11  Q.   Okay.  Thank you.
12  A.   But, yes.  For the most part, yes.
13          MR. DIEDERICH:  Judge, I request this be admitted
14  into evidence.
15          MS. COLLINS:  No objection.
16          THE COURT:  Okay.  2-A is received.
17          (Plaintiff's Exhibit 2-A received in evidence)
18  Q.   Mr. Anderson, I direct your attention to Plaintiff's
19  Exhibit 25, which is at Tab 25 in that binder.  The top of the
20  document reads "Inmate Disciplinary History"?
21  A.   Yes.
22  Q.   Okay.  Do you recognize that document?
23  A.   Well, looking at this -- I'm asking -- could you ask the
24  question again?  Do I recognize this document?
25  Q.   Yes.

Anderson—cross—Collins

1    Q.    Isn't it true, Mr. Anderson, that the only injuries you

2    received as a result of these beatings are some scrapes,

3    bruises and redness?

4    A.    No.

5    Q.    Mr. Anderson, you say that the Defendants all lied when

6    they wrote you up for having pills on April 11th, 2015; is

7    that correct?

8    A.    That's correct.  Yes.

9    Q.    Because you say you never had pills on you; is that

10   correct?

11   A.    Never.  Correct.

12   Q.    But isn't it true, Mr. Anderson, that you've been caught

13   with drugs and contraband while in prison at least 16 other

14   times?

15   A.    Well, yes, and -- never pills, though.

16           MS. COLLINS:  Your Honor, move to --

17   A.    Always marijuana.

18           MS. COLLINS:  -- strike.

19           THE COURT:  You see, this is another example, Mr. --

20   and, by the way, you're not the only witness to do this, so

21   I'm not picking on you.  But the question was, simply, "But

22   isn't it true, Mr. Anderson, that you've been caught with

23   drugs and contraband while in prison at least 16 other times?"

24   And your answer was, "Well, yes," and then you went on to say

25   it wasn't pills, it was marijuana --

Anderson—cross—Collins

1              THE WITNESS:  All right.

2              THE COURT:  -- or something like that.

3              So, really, the answer to that question would be,

4    yes, if that's the answer.  You don't have to further explain

5    it because she didn't ask you to explain it.  And, by the

6    way, your attorney, who knows what he's doing, will have an

7    opportunity to ask follow-up questions.  And if he wants to

8    ask you to explain an answer that you gave to Ms. Collins's

9    question, he'll do that.  But you can't do that.  You just

10   have to answer the questions that are asked.

11             THE WITNESS:  I apologize, Your Honor.

12             THE COURT:  And, again, don't apologize.  It's --

13             THE WITNESS:  I was just --

14             THE COURT:  Most witnesses do that.  But I just want

15   you to play by those rules.  Those are the rules, and you need

16   to just play by them.

17             Okay.  Next question.

18   Q.   Mr. Anderson, isn't it true that after inmates go and get

19   their evening medications in the clinic, if they want to, they

20   can go into the yard?

21   A.   Can you say that -- can you repeat that again, please?

22   Q.   Isn't it true, Mr. Anderson, that after inmates go to the

23   clinic to receive their medications in the evening, that

24   they're allowed to go to the yard?

25   A.   Only those who, who get medication, who receive

Sue Ghorayeb,  Official Court Reporter

Anderson-cross-Collins

1    medication.

2    Q.   And those who receive medications, they go on a

3    medication run; isn't that true?

4    A.   Yes.

5    Q.   And then after they receive their medications, if they

6    want to, they can go to the yard; isn't that true?

7    A.   Yes.  I'm sure, yeah.  I'm sure they can.

8    Q.   You just have to tell the escort officer that you want to

9    go to the yard; is that right?

10   A.   I don't remember the procedure, but you do have

11   opportunity to go to the yard if you are -- well.

12          MS. COLLINS:  Your Honor.  Move to strike.

13          THE COURT:  Denied.

14   Q.   Mr. Anderson, you say you weren't in the yard that

15   evening of April 11, 2015; is that right?

16   A.   Yes.

17   Q.   And that's because you weren't permitted to go into the

18   yard?

19   A.   Yes.

20   Q.   Okay.  So, on that day you weren't allowed in the yard.

21   But isn't it true, Mr. Anderson, that you were in places that

22   you weren't supposed to be on at least eight other times while

23   you've been in prison?

24   A.   Yes.

25          THE WITNESS:  That's a hard question, Your Honor.  I

Anderson-cross-Collins

1   wish I could elaborate on that a little?

2            THE COURT:  No.  Just answer the question.

3   A.   Not to that extent.  It's impossible to be to that

4   extent.  No.

5            THE COURT:  Okay.  That's your answer.

6            Next question.

7   Q.   Isn't it true, Mr. Anderson, that on December 15th, 2017,

8   you were found -- you were disciplined -- withdrawn.

9            Isn't it true, Mr. Anderson, that you were found to

10  be out of place on December 15th, 2017, while in Auburn

11  Correctional Facility?

12  A.   Out of place in Auburn, 2000- -- what year?  '17.  I

13  don't remember -- because being out of place is so common, you

14  know.  I can't recall, you know.  Everything is out of place,

15  you know, if they really wanna -- it's probably true.  Mm-hmm.

16  Q.   Isn't it true, Mr. Anderson, that you were found to be

17  out of place on March 8th, 2016, while at Great, Great Meadow

18  Correctional Facility?

19  A.   Possible, yes.

20  Q.   Isn't it true, Mr. Anderson, that on March 12, 2008, you

21  were found to have attempted escape a New York State prison?

22  A.   I was found when I attempted escape?

23  Q.   At Clinton Correctional Facility?

24  A.   I don't think it was attempted escape.  I think it was,

25  it was a conspiracy or something like that.  It was a

Anderson-cross-Collins

1    conspiracy.  Which was --

2              MR. DIEDERICH:  Your Honor, could the Court read

3    back -- or the stenographer read back the date?  I didn't

4    catch the date.

5              THE COURT:  March 12th, 2008.

6    Q.   Mr. Anderson, do you have Plaintiff's Exhibit 25 in front

7    of you?

8    A.   In here?

9    Q.   Please let me know when you've found that exhibit.

10   A.   25, yes.

11   Q.   Okay.  Can you please turn to the page that has been

12   Bates stamped on the bottom Anderson 325.

13   A.   Yeah.

14   Q.   Mr. Anderson, referring your attention to the first Tier

15   3 incident on that page.  Isn't it true, Mr. Anderson, that on

16   March 12, 2008, you've been disciplined for escape at Clinton

17   Correctional Facility?

18   A.   I mean, I do see escape, but I never escaped.  Maybe you

19   can ask that question again, or read that question again, if

20   you don't mind.

21   Q.   You were disciplined for escape at Clinton Correctional

22   Facility; is that true, Mr. Anderson?

23   A.   I was -- I recall being disciplined for -- no.  The

24   answer to your question is no.

25   Q.   Isn't it true, Mr. Anderson, that on November 24th, 2003,

Anderson—cross—Collins

1   you were disciplined for a movement violation while at Elmira

2   general?

3   A.   Movement violation, 2003, possibly, yes.

4   Q.   Isn't it true, Mr. Anderson, that on June 30th, 2003, you

5   were disciplined for being out of place while at Elmira

6   Correctional Facility?

7   A.   Possibly, yes.

8   Q.   Isn't it true, Mr. Anderson, that on February 4th, 2003,

9   you were disciplined for being out of place, also at Elmira

10  Correctional Facility?

11  A.   Again, probably yes.

12  Q.   Isn't it true, Mr. Anderson, that on August 12th of 2000,

13  you were again disciplined for being out of place at Clinton

14  Correctional Facility?

15  A.   Probably, yes.

16  Q.   Isn't it true, Mr. Anderson, that you have, in fact,

17  escaped prison?

18  A.   Have I escaped prison before, yes.

19  Q.   Three times?

20  A.   Three?  I mean, as an adult?  No.

21  Q.   Is it true that you've escaped prison three times at any

22  point in your life?

23  A.   Well, I had a couple of escapes as an adolescent.  And I

24  have one escape as an adult.

25  Q.   Isn't it true, Mr. Anderson, that you do, in fact, know

Anderson-cross-Collins

1   how to be out of place while in prison?

2   A.    Well, that depends on what you call out of place.  If you

3   look at it the way the Department, anything's out of place.  I

4   can be in the shower -- pardon me.  I can be in the shower and

5   go across the hall to get some water, and if a officer wanted

6   to, he could get me out of place.  They can write you out of

7   place for almost anything.  Any time they write a ticket, they

8   can add and justify an out of place.  And --

9   Q.    And, Mr. Anderson, you do, in fact, know how --

10  A.    I was just saying they can write you for out of place for

11  everything.  You know, it's a bit misleading, just reading it

12  without knowing the details.

13          MS. COLLINS:  Your Honor, I would move to strike Mr.

14  Anderson's testimony as nonresponsive.

15          THE COURT:  No.  Denied.  Next question.

16  Q.    Isn't it true, Mr. Anderson, that there's an active

17  fugitive warrant out on you in the state of Alabama?

18  A.    Yes.

19  Q.    Mr. Anderson, you testified yesterday that you had never

20  assaulted anyone in your life, period; is that correct?

21  A.    Yes.  Besides -- well, I did have a -- I did, yesterday,

22  testify that I had one fight out of 22 years I was here in

23  prison.  So, I -- if you want to count that.

24  Q.    Isn't it true, Mr. Anderson, that you testified yesterday

25  that you have, in fact, assaulted -- you've never assaulted

Anderson—redirect—Diederich

1   A.    No.

2   Q.    Thank you.

3         Do you know whether it's standard operating

4   procedure of the prison to have at least two Corrections

5   Officers escort a prisoner who is believed to be violent?

6   A.    Pardon me.  Could you say it again?

7   Q.    Actually, I withdraw the question.

8         Do you go, on occasion, to the infirmary to have

9   medications dispensed for you?

10  A.    At the time?

11  Q.    No, no.  Well, at —— during that time, yes.

12  A.    Well, during that time, I actually go to the infirmary

13  every day.  Well, my medication had ran out, so I no longer

14  went.  At the day, the day of the particular incident, I was

15  no longer going to the infirmary.

16  Q.    Does the —— when the, when the infirmary dispenses

17  medication to you, do they make a written record of such

18  dispensation?

19  A.    I'm sure they do.  I don't know their procedures, but I'm

20  sure they do.

21  Q.    Thank you.  Were you ever charged with being, "out of

22  place" regarding the events of April 11, 2015?

23  A.    No.

24        MR. DIEDERICH:  Your Honor, I have no further

25  questions.

Anderson-recross-Collins

1    they're not required to infer -- but could infer that your

2    client is making it up or at least exaggerating it and being

3    untruthful and that the doctors are being truthful.  I didn't

4    write it down because I didn't diagnose it.  I didn't write it

5    down because he never told me about it.

6              Is that what the witness is going to say?

7              MR. TURKLE:  Yes.

8              THE COURT:  All right.  Have a seat, Mr. Diederich.

9              Okay.  First of all, under Rule 501 of the Federal

10   Rules of Evidence, state law governs privilege regarding a

11   claim or defense for which state law supplies the rule of

12   decision.  And the relevant state law here is Section 4504 of

13   the New York Civil Practice Law and Rules, which states, in

14   pertinent part:  "Unless the patient waives the privilege, a

15   person authorized to practice medicine shall not be allowed

16   to disclose any information which he acquired in attending a

17   patient in a professional capacity and which was necessary to

18   enable him to act in that capacity."  Here -- that is CPLR

19   4504.  Here, however, state law does not supply the rule of

20   decision for Plaintiff's Eighth Amendment claims; therefore,

21   4504 doesn't apply.

22             In a Second Circuit case called U.S. against

23   Goldberger and Dublin, 935 F.2d 501, Second Circuit 1991, the

24   court said, "Indeed, in actions such as the instant one which

25   involve violations of federal law, it is the federal common

1    law of privilege that applies."  And unlike the

2    psychotherapist-patient privilege, which Mr. Diederich

3    mentioned earlier, which is recognized under federal common

4    law, federal common law, and that's Supreme Court case Jaffe

5    against Redman, 518 U.S. 1, no physician-patient privilege

6    exists under federal common law.  And I have an Eastern

7    District cite for that.  I'm sure there are other cases as

8    well, but the name of the case is Hasemann, 2018 Westlaw

9    5651357.  It's a 2018 Eastern District case.

10          But let's just assume for the moment that New

11   York's physician-patient privilege, in other words, Section

12   4504, let's assume that it did apply in this case.  If it

13   did, Plaintiff has clearly waived any such protection by

14   placing his physical condition in issue.  Here, the Plaintiff

15   has testified that the photographs taken of his person at the

16   SHU on April 11, 2015, do not show the extent of his injuries

17   from the alleged incidents of excessive force.  They fail to

18   show injuries to his head, his back and other areas of his

19   body.  And he has testified further today that there are --

20   about other claims of injury that he has which are not

21   reflected in the medical records.  And he said, I had them,

22   they're just not reflected in the medical records, so as to

23   suggest that somehow the medical providers are covering it

24   up.  In other words, it's not in the records because they

25   didn't want to write it down because somehow that would be

Anderson-recross-Collins

1    problematic for -- either for the officers involved or for

2    DOCCS generally.

3              In my view, to allow the Plaintiff's testimony --

4    which I did allow, it's in the record -- but to disallow the

5    Defendants to call Plaintiff's physicians -- although, I

6    think in this case, we're only talking about Bentivegna -- to

7    testify as to the Plaintiff's physical condition following

8    the incidents of April 11, 2015, would thus allow the

9    Plaintiff to use the privilege as a sword rather than as a

10   shield.  That's a quote from, actually, a New York State

11   case, but the principle applies here as well.  That's Green

12   against Montgomery, 95 New York 693, a 2001 case.

13             And also a quote from that case is as follows:  "A

14   party should not be permitted to assert a physical condition

15   in seeking damages and at the same time assert the privilege

16   in order to prevent the other party from ascertaining the

17   truth."  So, in other words, even if 4504 applied in this

18   case, which I don't believe it does, but even if it did, and

19   therefore New York law could be considered, under New York

20   law, the objection that the Plaintiff has has to be denied,

21   has to be overruled.

22             Moreover, under Rule 803(4) of Federal Rules of

23   Evidence, which sets forth an exception to the rule against

24   hearsay, a statement that is "made for and is reasonably

25   pertinent to medical diagnosis or treatment and describes

Anderson-recross-Collins

1    medical history, past or present symptoms or sensations,

2    their inception or the general cause," comes in, assuming

3    it's relevant, as an exception to the hearsay rule.  And here

4    that would be relevant because of what Mr. Anderson has

5    testified to.  He has -- again, he said that he sustained

6    injuries that are not reflected either in the photographs or

7    in the medical records.  And, so, statements made by the

8    Plaintiff to his physician after the alleged incidents for

9    the purposes of medical treatment or diagnosis are not

10   hearsay and are admissible to refute the statements made by

11   Mr. Anderson.

12           So, bottom line is that the Defendant is -- the

13   Defendants, I should say, are entitled to call Dr. Bentivegna

14   as a defense witness to contest Plaintiff's testimony

15   regarding the extent of his injuries.  All right.  We're

16   going to take a brief break, and --

17           MR. DIEDERICH:  Oh, your Honor, one additional

18   matter, really, really briefly.

19           THE COURT:  Okay.

20           MR. DIEDERICH:  My client is going to withdraw his

21   claims against Officer Dillon, based upon his testimony

22   yesterday that he has doubts about the actual identity of

23   Officer Dillon.

24           THE COURT:  Okay.  I assume you have no objection to

25   that?

Sue Ghorayeb,  Official Court Reporter

Hennig-Direct-Turkle

1  would get the inmates ready, and I would report to the block,

2  pick up the inmates as a group and bring them into -- into the

3  clinic for their meds.

4  Q.   What would you do when the -- strike that.

5           Would you remain at the clinic while the inmates

6  were getting their medication?

7  A.   Yeah, yes.

8  Q.   And what would you do after the inmates had gotten their

9  medications?

10 A.   After all the inmates receive their medication, same

11 thing.  We would exit the -- the clinic.  Some of the inmates

12 would go into E Block.  And at that time, yard would be, so

13 some of the inmates would go into the block and then other

14 inmates would go -- I would take them down to the yard.

15 Q.   And when you say "yard," are you referring to the

16 recreation yard?

17 A.   Recreation, yes.

18 Q.   And is that recreation yard E and F?

19 A.   Yes.

20 Q.   How would you know if an inmate on the med run was

21 entitled to go to the recreation yard?

22 A.   I wouldn't.

23 Q.   Now, when you -- you described earlier picking up inmates

24 at E Block.  Were you told then whether a -- a particular

25 inmate was entitled to go to recreation?

1   A.    No.

2   Q.    Are you familiar with the term "keep lock recreation"?

3   A.    Yes.

4   Q.    And what's the difference between keep lock and keep lock

5   recreation?

6   A.    Keep lock rec goes out.  Those are inmates that are on

7   keep lock because of disciplinary reasons.  They get one hour

8   rec a day, but they don't go out with the general population.

9   They go out with them by themselves at a different time.

10  Q.    And when you would take E Block to the infirmary and then

11  some of the inmates wanted to go out to the recreation yard,

12  were those general population inmates?

13  A.    Yeah.

14  Q.    What did you do after bringing the E Block inmates either

15  back to E Block or to the E and F recreation yard?

16  A.    I would be, you know, on standby at F and G corridor.

17  Q.    And approximately what time was this on April 11, 2015?

18  A.    Roughly 7:00 o'clock-ish.  6:30, 7:00 o'clock.

19  Q.    And do you specifically recall being in the F and G

20  corridor at about 7:00 o'clock on April 11, 2015?

21  A.    Yeah.

22  Q.    And what happened next?

23  A.    Officer Ernst had brought in Inmate Anderson, brought him

24  into the corridor on suspicion, and I -- I performed a pat

25  frisk.

1  Q.   Now, from where did Officer Ernst bring in Inmate

2  Anderson?

3  A.   From E -- from the E and F yard.

4  Q.   And were you able to see Officer Ernst enter the F and G

5  corridor?

6  A.   Yeah.

7  Q.   And did Officer Ernst come in through a particular

8  entrance?

9  A.   He came in through E and F yard.

10 Q.   And did he have Inmate Anderson with him?

11 A.   Yes.

12 Q.   And through what entrance did Inmate Anderson come?

13 A.   Same, E and F yard door.

14          THE COURT:  E and F yard what?  Sorry.

15          THE WITNESS:  Door.

16          THE COURT:  Door.  Door.  Sorry about that.

17 Q.   Now, on April 11th, 2015, how large a man was Inmate

18 Anderson?

19 A.   He was -- he was a big guy.

20 Q.   Approximately how much did he weigh?

21 A.   I would say probably around 300.  250, 300.

22 Q.   Now, after, after observing Officer Ernst and Inmate

23 Anderson coming into F and G corridor from the E and F yard,

24 what did -- what happened next?

25 A.   I ordered Inmate Anderson to put his hands on the wall

1    for a -- for a routine pat frisk.

2    Q.   What prompted you to perform a pat frisk?

3    A.   I was told Inmate Anderson was -- was being brought in

4    for suspicion.

5    Q.   Who told you that?

6    A.   Officer Ernst.

7    Q.   And what did you mean by for suspicion?

8    A.   At the time, you know, I didn't know.  It could be -- it

9    could be anything.

10   Q.   And describe what a pat frisk is.

11   A.    It's when an inmate puts his hands high up on the wall,

12   legs spread, and we kind of -- I guess not rub him down, but

13   pat him down over his clothes to check for contraband or

14   anything.

15   Q.   And what, if anything, did you uncover in performing this

16   pat frisk on Inmate Anderson?

17   A.    I found two white pills in his -- in his front pocket.

18   Q.   And did you know at the time what the nature of the pills

19   were?

20   A.    No.

21   Q.   And what did you do with the pills at that moment?

22   A.    I secured the pills and then notified area supervisor.

23   Q.   Now, I would like to direct your attention to the booklet

24   in front of you of Defendants' exhibits.  Oh.

25             I direct your attention to Defendants' Exhibit L for

Hennig-Direct-Turkle

1    identification.  Now, I direct your attention to the second

2    page of Defendants' Exhibit L for identification, the page

3    marked Anderson 24.

4             Can you tell me what Defendants' Exhibit L is, the

5    entirety of the exhibit?

6    A.   It's a photograph of the two white pills.

7    Q.   The two white pills that you uncovered from

8    Mr. Anderson's --

9    A.   Yes.

10   Q.   -- person?

11   A.   Yeah.

12   Q.   When was the photograph taken?

13   A.   On here it says on 4-11.

14   Q.   2015?

15   A.   2015, yeah.

16   Q.   And is this photograph a fair and accurate representation

17   of the pills that you found in Mr. Anderson's pant pocket?

18   A.   Yes.

19   Q.   Are these photographs taken in the normal course of

20   business of DOCCS?

21   A.   Yes.

22   Q.   And are the photos kept in the ordinary course of DOCCS's

23   business?

24   A.   Yeah.

25             MR. TURKLE:  I move to have Exhibit L admitted into

Hennig-Direct-Turkle

1   evidence.

2            MR. DIEDERICH:  No objection.  Judge.

3            THE COURT:  Exhibit L is received.

4            (Defendants' Exhibit L received in evidence)

5            MR. DIEDERICH:  I would like to ask the Court for

6   permission to publish Exhibit L to the jury.

7            THE COURT:  Sure.

8            MR. TURKLE:  I have two copies that they can look

9   at.

10           (Jury viewing exhibits)

11  Q.   Officer Hennig, did you know at the time what types of

12  pills you had uncovered from Mr. Anderson?

13  A.   No.

14  Q.   Did you come to learn what type of pills they were?

15  A.   I'm sorry?

16  Q.   Did you come to learn what type --

17  A.   Oh, yeah.  Yeah, yeah.

18  Q.   And what were they?

19  A.   I believe they were Neurontin.

20  Q.   Now, I know before we were discussing the difference

21  between keep lock rec and keep lock.  If somebody has a loss

22  of recreation privileges, could they be in general population?

23  A.   Yeah.  Yeah, loss of rec, yes.

24  Q.   What did you do with the pills after you recovered them?

25  A.   I took them to the clinic to have one of the nurses in

Sue Ghorayeb,  Official Court Reporter

1   the clinic identify them.

2   Q.   Now, you had testified a few seconds ago that after you

3   uncovered the pills, the area supervisor was contacted.  Do

4   you recall that testimony?

5   A.   Yeah, yeah.

6   Q.   And how long after the area supervisor was contacted did

7   he report to the scene?

8   A.   With -- within a minute.

9   Q.   And who was the area supervisor that night?

10  A.   Sergeant Osborne.

11  Q.   And how was he contacted?

12  A.   Via radio.

13  Q.   And what happened when Sergeant Osborne came into the F

14  and G corridor?

15  A.   I told him really quick, you know, what we found and

16  everything, and then he began to question Inmate Anderson.

17  Q.   Now, I would like you to go back to the binder of

18  Defendants' exhibits and turn your attention to Exhibit M,

19  which I -- I think has been marked as Defendants' Exhibit M-1

20  in evidence.  It's a series of photographs.

21          All right.  Can you point out for us which of those

22  photographs best depicts where you were performing the pat

23  frisk on Inmate Anderson?

24  A.   I would say M-3.

25          MR. DIEDERICH:  Your Honor, I request permission to

1    Inmate Anderson.

2            THE COURT:  Right, and he said M-3.

3            Correct?

4            THE WITNESS:  Yes.

5            THE COURT:  All right.  Next question.

6    Q.   All right.  Now, can you identify for the jury where on

7    that photograph the pat frisk occurred, as best you can?

8    A.   To the left side of the picture where that chair and that

9    locker is.  That wasn't there before, so it was right up

10   against that wall there.

11   Q.   Now, where was Officer Ernst when you were performing

12   the -- where was Officer Ernst when you were performing the

13   pat frisk on Inmate Anderson?

14   A.   To my -- behind me to my right.

15   Q.   And Sergeant Osborne arrived after the pat frisk had been

16   completed?

17   A.   Yes.

18   Q.   And what, if anything, occurred after Sergeant Osborne

19   arrived on the scene?

20   A.   When Sergeant Osborne -- like I said, I -- I briefed him

21   really quick and then he came over to my left side and began

22   to question the inmate.

23   Q.   Now, when you say you briefed him really quick, what did

24   you say?

25   A.   I just told him, you know, what we found.

1   Q.    And what was that?

2   A.    The two -- the two pills.

3   Q.    Okay.  And what did Sergeant Osborne do at that point?

4   A.    He -- he came over again to my left and began to question

5   Inmate Anderson.

6   Q.    And at the time that Sergeant Osborne was questioning

7   Inmate Anderson, where was Officer Ernst?

8   A.    Same place, behind me to my right.

9   Q.    And what happened next?

10  A.    With the -- with the questioning that sarge -- Sergeant,

11  Sergeant Osborne was doing, Inmate Anderson became nervous and

12  belligerent and stuff.  And then that's -- that's when he, you

13  know, punched Sergeant Osborne.

14  Q.    You observed Inmate Anderson punching Sergeant Osborne?

15  A.    Yes.

16  Q.    How many times did Inmate Anderson punch Sergeant

17  Osborne?

18  A.    I don't recall.

19  Q.    On what part of the body was he punched?

20  A.    Face.

21  Q.    And what did you do at that point?

22  A.    At that point, I had pushed Inmate Anderson into the wall

23  and tried to limit his movements.  And then at that time, he

24  had turned and -- and punched me.

25  Q.    How many times did Inmate Anderson punch you?

Hennig-Direct-Turkle

1   A.    Twice.

2   Q.    And where were you punched?

3   A.    In the -- on the left side of my face.

4   Q.    And were those punches -- how would you characterize

5   those punches?

6   A.    They hurt.

7   Q.    What did you do at that point?

8   A.    At that point, I just tried grabbing hold of Inmate

9   Anderson.  Officer Ernst came in to assist, and we kind of all

10   just went down onto the ground.

11   Q.    What was -- what was Sergeant Osborne doing?

12   A.    I don't -- I don't remember.

13   Q.    And did Inmate Anderson bang into anything on the way

14   down to the floor?

15   A.    We might have.  There's a bench off to the left.  We

16   might have hit the bench as -- as we all came down.

17   Q.    And what type of material is the bench made out of?

18   A.    I believe solid wood.

19   Q.    Did it have any cushions on it?

20   A.    No.

21   Q.    And ultimately, Inmate Anderson was brought to the floor?

22   A.    Yes.

23   Q.    What's the floor made out of?

24   A.    Concrete.

25   Q.    Did it have any rugs or coverings on it?

Sue Ghorayeb,  Official Court Reporter

Hennig-Direct-Turkle

1    A.    No.  No.

2    Q.    Why did you push Inmate Anderson against the wall?

3    A.    It limits his movements.

4    Q.    Now, briefly, I would like you to look back at -- at the

5    Tab Exhibit M in your binder, and specifically look at Exhibit

6    M-9.  Do you see that?

7    A.    Yeah.

8    Q.    And does that picture, Exhibit M-9, depict the bench that

9    Inmate Anderson might have fallen on on the way to the floor?

10   A.    Yes.

11         MR. DIEDERICH:  And I ask permission to publish M-9

12   to the jury.

13         THE COURT:  You may.

14   Q.    Now, the -- the manner in which you forced Mr. Anderson

15   to the wall after observing him punching Sergeant Osborne

16   and -- and being punched yourself, was this a technique that

17   you had been trained to use?

18   A.    Yeah.

19   Q.    And what about the manner in which Mr. Anderson was

20   brought to the floor?  Was that a technique you had been

21   trained to use?

22   A.    Yeah.

23   Q.    Did there come a time when -- well, when Mr. Anderson was

24   brought to the floor, what happened then?

25   A.    We just gave him multiple direct orders to stop

Hennig-Direct-Turkle

1  resisting, stop fighting, which he did not comply.  And

2  after -- after a struggle, after a while, we were able to get

3  him handcuffed.

4  Q.   How were you able to get him handcuffed?

5  A.   We had to force -- you know, force his arms behind his

6  back.

7  Q.   What role did you play in getting Mr. Anderson's arms

8  behind his back?

9  A.   I believe I had -- I had one arm.

10 Q.   And who had the other arm?

11 A.   And Officer Ernst.

12 Q.   And who applied the handcuffs?

13 A.   Sergeant Osborne.

14 Q.   And after the handcuffs were applied, was Mr. Anderson

15 compliant?

16 A.   Yes and no.

17 Q.   What do you mean by that?

18 A.   It's -- I mean, he was because now he was, you know,

19 handcuffed, but he was still kind of, you know, struggling a

20 little bit.

21 Q.   And what happened next?

22 A.   We stood Mr. Anderson up, and then at that time, I was

23 directed by another supervisor to report to the clinic.

24 Q.   Did you have any further encounter with Mr. Anderson on

25 April 11, 2015?

Hennig-Direct-Turkle

1   A.    No.

2   Q.    And I direct your attention to the binder of Plaintiff's

3   exhibits.

4           MR. DIEDERICH:  Is that up there?  Oh.

5   Q.    And direct your attention to what has been marked

6   Plaintiff's Exhibit 22.

7   A.    22 you said?

8   Q.    Yes.  Do you see Plaintiff's Exhibit 22?

9   A.    Yes.

10  Q.    And can you tell me what that document is?

11  A.    It's an employee accident report.

12  Q.    And does your signature appear anywhere on that document?

13  A.    Yes.

14  Q.    And what's reflected on that document?

15  A.    That I was struck on the left side of my face by

16  inmate -- Inmate Anderson.

17  Q.    And what type of injuries, if any, are reflected on that

18  report?

19  A.    Just swelling and -- swelling to my eyelid and my --

20  bruising to my cheek.

21  Q.    Did you receive any further treatment after April 11th,

22  2015?

23  A.    No.

24  Q.    Now, prior to the incident on April 11, 2015, had

25  Sergeant Osborne directed you to bring Mr. Anderson to the F

Hennig-Redirect-Turkle

1            MR. TURKLE:  Yes.  It's Plaintiff's Exhibit --

2            THE COURT:  You can read it to the jury.  It's not

3    really necessary, but anyway, I'm going to allow it.  I gave

4    Mr. Diederich wide leeway in asking questions, so I'm going to

5    give the A.G. a little leeway as well.  I don't remember the

6    question, however.

7            Did you charge Mr. Anderson in the misbehavior

8    report, which is Exhibit 11, with being out of place?

9            THE WITNESS:  No.

10           THE COURT:  The answer to that is?

11           THE WITNESS:  No.

12           THE COURT:  No.

13   Q.   And why didn't you?

14   A.   I didn't know at the time.

15           MR. TURKLE:  I have nothing further.

16           THE COURT:  Anything further, Mr. Diederich?

17           MR. DIEDERICH:  No, Your Honor.

18           THE COURT:  Okay.  Thank you, sir.  You can step

19   down.

20           Okay.  Next witness.

21           MR. TURKLE:  Yeah, we would like to re-call Officer

22   Ernst.

23           THE COURT:  Okay.

24           THE CLERK:  The Court reminds you you are still

25   under oath.

1  A.   The first thing I noticed was that he appeared to have

2  too many layers of clothing on, which our department has a

3  policy against wearing too many layers of clothing.  That's

4  what first brought my attention.  The next thing I noticed was

5  that he had his right hand kind of buried into his right left

6  pocket, which seemed suspicious.

7  Q.   Why did it seem suspicious?

8  A.   You're allowed to only have one hands in your pocket.

9  Q.   What's the significance of somebody wearing too many

10 layers?

11 A.   They can use it to conceal contraband, or if they're

12 planning on fighting somebody, they use it as extra padding.

13 Q.   Now, after observing Mr. Anderson wearing too many layers

14 and having one hand in his pocket, what did you do next?

15 A.   I got the attention of the other officers in the yard and

16 I told them I'm going to bring this inmate into the corridor.

17 Q.   And was it standard operating procedure to bring

18 Mr. Anderson into the corridor?

19 A.   Yes.

20 Q.   And into which corridor did you enter?

21 A.   F and G corridor.

22 Q.   And you were in the E and F yard?

23 A.   Correct.

24 Q.   What did you do when you entered the F and G corridor?

25 A.   I walked in with the inmate.  Officer Hennig was there.

Ernst-Direct-Turkle

1    He asked what was going on.  I told him I'm bringing him in

2    for a pat frisk.

3    Q.   What happened next?

4    A.   Officer Hennig ordered the inmate to put his hands on the

5    wall, submit to a pat frisk.  He started patting the inmate

6    down and found two white pills in his right front pocket.

7    Q.   Did you see the pills?

8    A.   I did.

9    Q.   And do you know -- did you know at that time what type of

10   pills they were?

11   A.   I did not.

12   Q.   Where were you standing in relation to Officer Hennig?

13   A.   Behind him to the right.

14   Q.   Was there anybody else in the immediate area?

15   A.   No.

16   Q.   Strike that.  Describe Mr. Anderson's behavior during the

17   pat frisk.

18   A.   He was compliant.

19   Q.   What happened after Officer Hennig located two pills in

20   Mr. Anderson's pant pocket?

21   A.   He radioed for the supervisor.

22   Q.   And who was the supervisor that night?

23   A.   Sergeant Osborne.

24   Q.   And how long did -- did -- did Sergeant Osborne respond

25   to the scene?

Ernst-Direct-Turkle

1   A.   No.

2   Q.   At the time that the handcuffs were applied to Mr.

3   Anderson immediately before you went to the infirmary, did Mr.

4   Anderson complain to you of any injuries he had sustained?

5   A.   No.

6   Q.   Did you observe any injuries on Mr. Anderson?

7   A.   No.

8   Q.   Now, are you aware of whether a misbehavior report was

9   issued to Mr. Anderson?

10   A.   Yes, one was.

11   Q.   And do you know whether the the misbehavior report

12   included the charge of being out of place?

13   A.   I don't believe it was on there.

14   Q.   And do you know why it wasn't on there?

15   A.   I didn't -- we didn't know at the time.

16   Q.   You didn't know at the time what?

17   A.   That he was on loss of rec.

18   Q.   When, if ever, did you punch Mr. Anderson on April 11,

19   2015?

20   A.   Never.

21   Q.   And when, if ever, did you knee Mr. Anderson on April 11,

22   2015?

23   A.   Never.

24   Q.   And when, if ever, did you kick Mr. Anderson on April 11,

25   2015?

Ernst—cross—Diederich

1  policy.

2  Q.   Okay.  And you didn't need to turn him over to Officer

3  Hennig for the pat frisk, correct?

4  A.   No, I didn't need to, but Officer Hennig was there.

5  Q.   You know how to conduct pat frisks, correct?

6  A.   Yes.

7  Q.   And you were the one that saw my client with his hands in

8  his pocket, so you could have focused the pat frisk upon my

9  client and his pocket, correct?

10  A.   I'm sorry.  Can you repeat that?

11  Q.   Had you conducted a pat frisk, you could have focused on

12  my client's pocket, correct?

13  A.   I could have, yes.

14  Q.   The truth, is it not, is that Officer Hennig brought my

15  client to the F and G corridor from his cell?  Isn't that

16  correct, Officer?

17  A.   No, sir.  I brought the inmate in from E and F yard.

18  Q.   It's true that -- isn't it true that when you were in the

19  F and G corridor, you didn't realize that my client had been

20  brought from his cell, correct?

21  A.   No.  I brought the inmate in from E and F yard.

22  Q.   In the F and G corridor, you assumed that my client was

23  brought from the rec yard to the F and G corridor, correct?

24          MR. TURKLE:  Objection.

25          THE COURT:  Sustained.  He just said he brought him.

Sue Ghorayeb,  Official Court Reporter

Ernst--cross--Diederich

1    So, I guess, if you mean you assume he was brought there

2    because you brought him.

3            Did you bring him there from -- is that your

4    testimony, that you brought Mr. Anderson from the E and F rec

5    yard to the F and G corridor?

6            THE WITNESS:  Correct.

7            THE COURT:  Okay.  Next question.

8    Q.   And assuming for a moment that my client's testimony is

9    correct, at the time of my client's presence in the F and G

10   corridor, you had no knowledge that my client had a rec

11   restriction, correct?

12   A.   I'm sorry.  Can you repeat that?

13   Q.   You had no knowledge that my client had a recreation

14   restriction on that date and time, correct?

15   A.   No.  If I had, I would have brought him in immediately.

16           THE COURT:  Do you know whether people -- if, if --

17   let me ask you this.  And I think -- I'm not sure if you

18   testified to this or it was a different witness.  But if --

19   you can have a recreation yard restriction but still be in

20   general population, right?

21           THE WITNESS:  Correct.

22           THE COURT:  In other words, you're not restricted to

23   your cell or sort of to SHU or anything else.  You are in

24   general population, but you can also have a restriction on no

25   rec.

Sue Ghorayeb,  Official Court Reporter

Melville-direct-Collins

1  A.    The inmate?

2  Q.    Yes.

3  A.    He normally would just tell the officer.  They -- what

4  they call as the go around.  The officer goes to each cell.

5  The inmates let them know what they want for the evening, or

6  the day, depending on the time, and he would let them know

7  that he has to go to the 7:00 clock meds.  And then when they

8  call the meds, he would be let out of the cell to go to the

9  meds, and the only thing he needs is his ID to show the nurse

10  so they know who he is.

11  Q.    So even if he's on loss of rec, he can tell the officer

12  at his housing block that information?

13  A.    What, the inmate?

14  Q.    Yes.

15  A.    The officer should know it, but the inmate's not

16  obligated to tell him he's on loss of rec, no.

17  Q.    Would the officer who escorts the inmates from the

18  housing block to the clinic know whether inmates in that group

19  are on loss of rec?

20  A.    As a norm, probably not.

21  Q.    Are inmates who are on loss of rec always confined to

22  their cells?

23  A.    Not at all.

24  Q.    Can they go get dinner?

25  A.    They can get dinner.  They go to their programs.

1                    (Jury present in the courtroom)

2                    THE COURT:  Have a seat, everybody.

3                    Okay.  Next witness.

4                    MS. COLLINS:  Defendants call Officer Snedeker.

5                    THE COURT:  Come on up, sir.

6                    THE CLERK:  I want to remind you you are still under

7    oath.

8    R O B E R T   S N E D E K E R

9    having been previously duly sworn, was examined and testified

10   further as follows:

11   DIRECT EXAMINATION

12   BY MS. COLLINS:

13   Q.   Good afternoon, Officer.

14                    Officer Snedeker, did you assault Mr. Anderson?

15   A.   No, I did not.

16   Q.   Did you -- did you kick Mr. Anderson?

17   A.   No.

18   Q.   Did you punch Mr. Anderson?

19   A.   No.

20   Q.   Did you stomp on Mr. Anderson?

21   A.   No.

22   Q.   Did you kick Mr. Anderson in the head?

23   A.   No, I did not.

24   Q.   Did you stomp on Mr. Anderson's head?

25   A.   No.

Snedeker—direct—Collins

1    Q.    Did you knee him in his leg?

2    A.    No.

3    Q.    Did you twist his handcuffs?

4    A.    No.

5    Q.    Did you beat him with a baton?

6    A.    No.

7    Q.    Have you ever done any of these things to physically harm

8    Mr. Anderson?

9    A.    No.

10   Q.    Have you ever witnessed any other officer do any of these

11   things to Mr. Anderson?

12   A.    No.

13            MS. COLLINS:  No further questions.

14            THE COURT:  Any cross?

15            MR. DIEDERICH:  Yes, Your Honor.

16   CROSS-EXAMINATION

17   BY MR. DIEDERICH:

18   Q.    Did you witness my client assault Sergeant Osborne?

19   A.    No, I did not.

20            MR. DIEDERICH:  No further questions.

21            THE COURT:  Just remind me, Officer, when did you

22   get to the scene of the incident in the corridor?

23            What did you -- when you got there, what was

24   happening at that moment?

25            THE WITNESS:  When I arrived, the inmate was laying

Sue Ghorayeb,  Official Court Reporter

 1    examination shows.

 2    Q.   And there is also a section for plan.  What does plan

 3    refer to?

 4    A.   Plan is, based on your assessment, what you're gonna do

 5    for the patient.

 6    Q.   On the other side of that page, there's an indication for

 7    provider orders.  What does that refer to?

 8    A.   Provider's orders are how you're going to implement your

 9    plan for the patient.  And that -- that's for your own

10    reference and for the nurses, if they see it.

11    Q.   Okay.  So, Doctor, do you see the record for April 11th,

12    2015?

13    A.   Yes.

14    Q.   Is there an indication of the time that this record was

15    made?

16    A.   It's marked as 7:05 p.m.

17    Q.   Mr. -- Dr. Bentivegna, can you please read what the

18    subjective portion is, written in that medical record?

19    A.   Yes.  "Use of" -- it's titled "Use of Force.  Inmate

20    examined in boxers in SHU.  Redness/no swelling noted to right

21    four small toes.  Red superficial markings to bilateral

22    wrists, front and back of wrists, approximately 2 inches.

23    Superficial scrape to right rear shoulder.  Right thigh with

24    noticeable swelling, larger than left thigh.  Inmate ambulates

25    with limp.  Inmate states right outer portion of hand and neck

Bentivegna-direct-Collins

1    hurting and headache.  No redness or swelling or bruises noted

2    to neck or head area at this time.  Vital signs stable."  The

3    vital signs are documented.  "Transported to Putnam Hospital

4    Center for further evaluation of injuries.  Dr. Wolff

5    notified."

6    Q.    In layman's terms, what injuries did Mr. Anderson have

7    that's noted here?

8    A.    Well, he had some redness to his toes, some redness of

9    his wrists, a little scrape on his shoulder, and a swollen

10   thigh on the right side.

11   Q.    In your experience, what can cause redness of the wrists?

12   A.    In this context, generally, you would consider that

13   probably is a mark that comes from having handcuffs put on.

14   Q.    Reviewing the entire exhibit before you, where does it

15   say that Mr. Anderson had any head injuries?

16   A.    They did not document any head injuries.

17   Q.    Dr. B, what are the signs of a concussion?

18   A.    Generally, you might have loss of consciousness, some

19   memory loss, confusion.  You might see the pupils are

20   unequally dilated.

21   Q.    Did Mr. Anderson have a concussion?

22           Do these records reflect that Mr. Anderson had a

23   concussion?

24   A.    It does not appear that way, no.

25   Q.    Do the records reflect that Mr. Anderson had any signs or

1   A.   April 14th, 2015.

2   Q.   What, if anything, did Mr. Anderson complain to you about

3   on that day?

4   A.   Complained of left elbow and right knee pain, headache,

5   and left rib pain.

6   Q.   And what was your objective impression?

7   A.   The, the joint injuries, the knee, the elbow, these had

8   been -- these were old injuries.  He had had surgery on his

9   knee previously.  He had had x-rays of his elbow.  The rib

10  complaint was new, and --

11  Q.   And what did you do with respect to Mr. Anderson's rib

12  complaint?

13  A.   We ordered an x-ray to make sure he didn't have a

14  fractured rib.

15  Q.   And what was the result of that x-ray?

16  A.   He did not have a fractured rib.

17  Q.   Is there anything in the records to indicate that Mr.

18  Anderson had a head injury?

19  A.   Other than his complaints, no.

20  Q.   Where in the records, Doctor, does it indicate that Mr.

21  Anderson's arms were out of his socket?

22  A.   It does not.

23  Q.   If Mr. Anderson's arms were out of their socket, would

24  that be noted in the record?

25  A.   I would imagine so.

Bentivegna-direct-Collins

1  Q.   What was your assessment of Mr. Anderson's condition at
2  this time?
3  A.   That he had some post-traumatic signs of -- that he had
4  been involved in a trauma but that he was medically stable.
5  Q.   In your experience as a DOCCS' provider, when, if ever,
6  have you treated inmates following the use of force?
7  A.   Quite frequently.
8  Q.   If an inmate resists being restrained and forces use to
9  restrain him, what, if any, injuries would you expect to see?
10  A.   Well, the range is -- there's a wide range.  The wrists,
11  the redness around the wrists, is pretty common.  I would
12  expect some, I would say, bumps and bruises.
13  Q.   And are those the injuries that are reflected on Mr.
14  Anderson?
15  A.   Yes.
16  Q.   Doctor, what injuries would you expect to see on an
17  individual who had been punched, kicked, stomped on repeatedly
18  in the face and body by many individuals during the course of
19  one day, each incident lasting several minutes?
20  A.   I would expect to see some pretty severe bruising and
21  perhaps fractures.
22  Q.   Are any of those signs noted on Mr. Anderson?
23  A.   No.
24  Q.   Doctor, what would happen if a licensed medical
25  professional, a doctor or a nurse, falsified medical records?

Bentivegna-direct-Collins

1  A.   That's considered to be an act of professional

2  misconduct.

3  Q.   And what, if anything, would happen to them if they did

4  this?

5  A.   They might be disciplined.  They could -- technically,

6  they could lose their license, I suppose.

7  Q.   Doctor, are you familiar with the term "Neurontin"?

8  A.   Yes.

9  Q.   What is Neurontin?

10  A.   It's a medication --

11       MR. DIEDERICH:  Your Honor, I think we might be

12  getting into the doctor's expertise at this point.

13       THE COURT:  Sustained.

14  Q.   In your experience, Doctor, does the Department of

15  Corrections classify medications in separate ways from each

16  other?  Withdrawn.

17       What, if any, classifications does DOCCS give to

18  medications that are provided to inmates?

19  A.   Well, there's a certain, there's a certain category of

20  drugs that are considered to be abused, and there is a special

21  category called medications with abuse potential.

22  Q.   And why does DOCCS classify these medications in that

23  way?

24  A.   Because those are drugs that tend to be abused in the

25  system.  And we try to limit the use of them to cases where

Bentivegna—cross—Diederich

1   are you referring to the physical manifestations of a problem,

2   a trauma?

3   A.   Yeah.

4   Q.   And are you not referring to the psychological or

5   psychiatric manifestations that might result from a trauma,

6   for example, posttraumatic stress disorder?

7            MS. COLLINS:  Objection.

8            THE COURT:  Well, you can rephrase that.  I'll

9   sustain the objection as to form.

10  Q.   Did you evaluate my client for possible posttraumatic

11  stress disorder?

12  A.   No.

13  Q.   And is posttraumatic stress disorder a possible result

14  from traumatic stress?

15  A.   I would say so.

16  Q.   Dr. Bentivegna, when you're providing healthcare services

17  to a patient, is your duty of loyalty to the patient or to

18  your employer, DOCCS?

19  A.   To the patient, I would say.

20  Q.   Okay.  And is it your understanding that communications

21  between the patient and you are privileged physician—patient

22  communications?

23  A.   As far as consistent with, with the needs of the

24  facility, yes.

25  Q.   Are you aware of New York State law that, that makes ——

Bentivegna-cross-Diederich

1   that creates a privilege between patients and their

2   physicians?

3   A.   Yes.

4           THE COURT:  You know, that, that's an improper

5   question, Mr. Diederich, in light of prior discussions that

6   we've had on the record.  But, anyway, he answered it.  You're

7   gonna have to move on to something else.

8   Q.   You were asked to be here today by --

9           THE COURT:  Unless you can explain to me why it

10  would be relevant, in which case you'd have to do it at the

11  side bar.  But go ahead.  Next question.

12  Q.   You were asked to be here today at the request of your

13  employer, correct?

14  A.   Yes.

15  Q.   Now, you indicated before that as a result of use of

16  force incidents, there's commonly -- there are commonly,

17  quote/unquote, bumps and bruises?

18  A.   Yes.

19  Q.   But it's true, is it not, that my client evidenced much

20  more than mere bumps and bruises in connection with the

21  incident of April 11th, 2015?

22  A.   Yes.

23  Q.   Neurontin is a nonnarcotic drug, correct?

24  A.   That's correct.

25  Q.   And it's not a controlled substance, correct?  If you

Bentivegna-redirect-Collins

1  Q.   Doctor, if you could look in front of you, there should

2  be a binder that's marked Plaintiffs' exhibits.  I believe

3  it's blue.

4           THE WITNESS:  Thank you, sir.

5           THE COURT:  There it is.

6  Q.   If you could turn your attention to the tab that has been

7  marked Plaintiffs' Exhibit 26, which is in evidence, and

8  please take a moment to review these records.

9           THE COURT:  Generally, do you -- do you know what

10  these records consist of, generally?

11           THE WITNESS:  Yes, sir.  They're hospital discharge

12  records.

13           THE COURT:  Which hospital?

14           THE WITNESS:  Putnam Hospital, sir.

15  Q.   Were these records made after the use of force medical

16  notation on April 11th, 2015?

17  A.   Appears to be so, yes.

18  Q.   Is there any indication that Mr. Anderson had a

19  concussion in these records?

20  A.   No.

21  Q.   Doctor, is Neurontin the kind of drug that inmates

22  smuggle in prison?

23  A.   Yes.

24  Q.   Is that because it's classified as a controlled substance

25  by DOCCS?

Sue Ghorayeb,  Official Court Reporter

Freeman-direct-Collins

1             In any event, I'm still struggling.  What exactly
2    is the rebuttal evidence?  Not something that you just forgot
3    to put in.  That's too bad.  That ship has sailed.  I'm not
4    talking about that.  I'm talking about rebuttal evidence.
5             MR. DIEDERICH:  As to rebuttal, Your Honor, the
6    Defendants claim they were not there or my client has
7    misidentified them.  And I would like my client to make clear
8    that, from the beginning of this case, my client clearly knew
9    and identified Osborne, Hennig and Ernst, but that he did not
10   know the names of other people.  He had to find that out.  He
11   listed them as John -- basically John Doe on his grievance.
12   And he had to go through FOIL and other means to attempt to
13   identify the other Defendants.  So, Your Honor, I think --
14            THE COURT:  Why is that rebuttal?  If that's
15   relevant -- I'm not even sure if it is relevant.  But even if
16   it is, why wouldn't he do it on his direct examination?  Here
17   is how I figured out who these people are.
18            MR. DIEDERICH:  But he didn't know --
19            THE COURT:  And here are their names.
20            MR. DIEDERICH:  He didn't know at the time, Your
21   Honor, they were going to claim --
22            THE COURT:  He didn't know at the time of his direct
23   testimony?
24            MR. DIEDERICH:  No.
25            THE COURT:  Of course, he did.

                 Sue Ghorayeb,  Official Court Reporter

Freeman-direct-Collins

1          MR. DIEDERICH:  I don't really know what the

2    defense -- defense's defense is until they put on their case.

3    And on their case, they're saying, we weren't there and you,

4    Plaintiff, are, are incredible because you're identifying the

5    wrong people.  And I think it's important for my client to

6    point out that he knew for sure three, but -- you know, but he

7    had to go through other means to try to identify the others.

8    That's all -- that's one --

9          THE COURT:  So, the gist of it is that you didn't

10   know until they testified that they were going to say they

11   were not there, some of them anyway?

12         MR. DIEDERICH:  Some.

13         THE COURT:  I mean, Ernst and Freeman and -- strike

14   that.  Ernst and Hennig and Osborne said they were there.

15   Snedeker said he was there, although after the altercation had

16   ended.

17         So, on the Joint -- that's Joint -- Pretrial Order,

18   there was a summary of claims and defenses.  And on Page 3 --

19   this was a document that you signed, by the way, Mr.

20   Diederich.  On Page 3, it says, "Sergeant Osborne" -- this is

21   the -- under the Defendants' Summary of Claims and Defenses.

22   On Page 3, it says, according to the Defendants, "Osborne,

23   Ernst and Hennig used reasonable force to gain control of

24   Plaintiff.  Snedeker was not personally involved in the use

25   of force incident."

1           And then the next paragraph says, "With respect to

2    Plaintiff's claims that C.O.s Morel and Freeman assaulted him

3    while they escorted him from the corridor to SHU and then

4    from the SHU to the infirmary, Plaintiff cannot demonstrate

5    the personal involvement of either officer in any alleged

6    constitutional violation," quote, "because they did not

7    actually escort Plaintiff anywhere," end quote.

8           And then it goes on to talk about Dillon, who's no

9    longer in the case.  So, I'm sorry.  What part of that was --

10   were you not aware of before your client testified?

11          You just told me, as a lawyer -- you're a member of

12   the Bar of this court, and I, again, appreciate greatly your

13   willingness to take this case on a pro bono basis.  That

14   doesn't relieve you of your ordinary obligations as a member

15   of the Bar.  And you just said, I think you said -- I mean, I

16   can check the transcript, but I think you just said, "my

17   client wasn't aware that the Defendants were going to claim

18   that they weren't even there, or at least Morel and Freeman

19   were not even there, until they testified."  But that's not

20   true.  It says it right here --

21          MR. DIEDERICH:  But I guess --

22          THE COURT:  -- explicitly.

23          MR. DIEDERICH:  I guess, as a -- I'm thinking about

24   it just as a trial procedure matter.  I think I put on my

25   client's case.  He testified --

1          THE COURT:  Knowing, knowing that the defense is

2     they weren't there.  That was -- their defense is Ernst,

3     Hennig, Osborne and Snedeker, although two -- the first three

4     were there for the altercation.  Snedeker was not there for

5     the altercation.  It's all set forth explicitly in the

6     Pretrial Order as a -- as part of the defense.  The whole

7     point of this is to give you notice of what their defense is.

8          So, they said to you, listen, Plaintiff, these

9     people were there, Snedeker was there but he was not involved

10    in the use of force incident, and then, moreover, Freeman and

11    Morel were not there at all, that they were not involved in

12    any escort of the Plaintiff anywhere.

13         Is that what they both testified to in their

14    testimony, Morel and Freeman?

15         MS. COLLINS:  They were not involved, correct.

16         THE COURT:  In the escort, period?  Not just that

17    they didn't beat him.  They just weren't -- they didn't --

18    weren't there.  They didn't escort him from corridor to SHU,

19    SHU to infirmary.

20         MS. COLLINS:  That's what the evidence shows, Your

21    Honor, yes.

22         THE COURT:  Well, that's what they testified to.

23    It's up to the jury to decide what the evidence is.  Is that

24    what they testified to?

25         MS. COLLINS:  Morel testified he was not even there.

Sue Ghorayeb,  Official Court Reporter

Freeman-direct-Collins

1              THE COURT:  What about Freeman?  Let's get to the

2    bottom line here.

3              MS. COLLINS:  The documents show that Officer

4    Freeman did not escort Plaintiff anywhere.

5              THE COURT:  Okay.  Morel was not there because he

6    wasn't working.

7              MS. COLLINS:  Correct.

8              THE COURT:  According to the evidence that the

9    Defendants have presented, which is consistent with what it

10   says here.

11             MS. COLLINS:  Correct.

12             THE COURT:  And Freeman is saying, I just didn't

13   escort him anywhere.  Right?  Isn't that what he said?

14             MS. COLLINS:  Essentially, that's correct, Your

15   Honor.

16             THE COURT:  Just tell me what he said.  I don't have

17   a memory that's -- it's your case.  What did he say on your

18   case?

19             That's all I'm asking.  It's a reasonable -- I can

20   go back and spend an hour or two and examine the record.  I

21   really don't want to do that.

22             MS. COLLINS:  Your Honor, on Defendants' case,

23   Officer Morel testified that he never assaulted Mr. Anderson.

24             THE COURT:  Morel was not there.  That's your

25   evidence.  He wasn't even working that day.

Freeman-direct-Collins

1              MS. COLLINS:  Correct.

2              THE COURT:  Okay.  Freeman, I'm asking about.  What

3    did Freeman testify to?

4              MS. COLLINS:  Officer Freeman testified that he did

5    not assault Mr. Anderson at any time, did not punch.  The

6    documents show that Mr. Freeman -- Officer Freeman did not

7    escort.

8              THE COURT:  Well, you're struggling with answering

9    my direct question, so I'm going to go review the transcript.

10   I shouldn't have to do this, but I will.

11              (Recess)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present in the courtroom)

2          THE COURT:  All right.  So, in addition to what I

3    just referred to a moment ago in the Joint Pretrial Order

4    where it explicitly says -- under the summary of claims and

5    defenses and then the subheading of four Defendants, it says,

6    "Osborne, Ernst and Hennig used reasonable force.  Snedeker

7    was not personally involved in the use of force incident.  And

8    as to Morel and Freeman, Plaintiff cannot demonstrate personal

9    involvement of Morel and Freeman because they did not actually

10   escort Plaintiff anywhere."  So, that's all in the -- in that

11   section of the Pretrial Order.

12          Then, further on in the Joint Pretrial Order,

13   there's a one-paragraph summary of the expected testimony of

14   each defense witness, and Hennig's is in here and Ernst's is

15   in here, Osborne's is in here.  And, then, as to Morel, it

16   says that "Morel will testify that he was not working on

17   April 11th or 12th and didn't assault anyone or didn't see

18   anybody assault anyone."

19          It says that Freeman will testify that "he had no

20   involvement in any use of force on April 11th and did not

21   assault or otherwise observe anyone assault Plaintiff."  And

22   Snedeker says in this Pretrial Order he'll testify that "he

23   escorted Plaintiff from F and G corridor to SHU and then to

24   the infirmary and will testify that he did not assault

25   Plaintiff or observe anyone assault Plaintiff."

Freeman-direct-Collins

1             On the Plaintiff's case -- the Plaintiff's case

2    now -- before the Plaintiff testified, he called, I believe,

3    all of those witnesses, but let's just focus on Freeman for a

4    moment.  This is the Plaintiff's case:

5             "Question:  On that date, meaning April 11th, were

6    you involved in any altercations or any involvement at all

7    with my client, Jerome Anderson?

8             "Answer:  No."

9             And then there was a lot of additional questions

10   about documents and whether they can be inaccurate or

11   something.  But, basically, Freeman said, "no, I had nothing

12   to do with your client on that day."  And then, of course,

13   Freeman, on the defense case, just testified that --

14   basically gave the same testimony that he gave on Plaintiff's

15   case.

16            So, I'm still struggling with what exactly you want

17   to do on rebuttal that you didn't have the full and fair

18   opportunity to do on your case.  And I'll note for the record

19   that your client testified after all of the Defendants

20   testified on your case.  So, for example, he testified after

21   Freeman and Morel said they had nothing to do with it, they

22   weren't there.  He testified after Snedeker said --

23   testified.  Did you call Snedeker on your case?

24            I believe you did.

25            MR. DIEDERICH:  I believe I did, Your Honor, yes.

Sue Ghorayeb,  Official Court Reporter

Freeman-direct-Collins

1           THE COURT:  Is that right, Ms. Collins?

2           MS. COLLINS:  Yes, Your Honor.

3           THE COURT:  So, he testified after Snedeker

4    testified when Snedeker said -- I'll note also that in the

5    opening statement, in Mr. Turkle's opening statement, he said

6    that Snedeker arrived after the altercation had ended.

7           Yeah, Snedeker did testify in the Plaintiff's case,

8    and he said the same thing.  "I got there after the incident

9    ended."  In essence, "I escorted him to the SHU and I didn't

10   hurt him or assault him in any way or see anyone else do

11   that."  Okay.  With that backdrop, what exactly is your

12   rebuttal, exactly, precisely?

13          MR. DIEDERICH:  I have a few items on rebuttal.

14          THE COURT:  A few items, okay.  You are starting to

15   test my patience just a little bit, Mr. Diederich, but go

16   ahead.  I'm going to give you an opportunity to put on the

17   record that which you would seek to offer on rebuttal.

18          MR. DIEDERICH:  The least important one is -- issue

19   is what we are discussing, Your Honor, which I have a very

20   limited purpose for rebuttal on --

21          THE COURT:  Just tell me what you want to do.

22   You're not -- do you know what the word "proffer" means?

23          The word "proffer" means:  Judge, if called as a

24   witness on rebuttal, Witness X will testify as follows, or

25   alternatively, if offered into evidence on rebuttal,

Sue Ghorayeb,  Official Court Reporter

1  documents A, B and C would show as follows.  Try to follow

2  that format, please.  And I need to keep moving here, okay?

3  Please.

4          MR. DIEDERICH:  If called to testify in rebuttal on

5  the issue regarding --

6          THE COURT:  If called to testify on rebuttal, my

7  client would say X.

8          MR. DIEDERICH:  Will testify that when he had his

9  grievance a long time ago, he knew who Officers Ernst, Osborne

10 and Hennig were, but the other Defendants were basically John

11 Does to him.  He did not know their identities, just their

12 faces.  During his testimony, he testified that he believed

13 the other people --

14         THE COURT:  I already heard his testimony.  Tell

15 me -- all I asked is what he will say on rebuttal.  That's all

16 I care about at this point.

17         He already testified.  That's -- we're done with

18 that part.  Now, what is he going to testify to?

19         So, you're saying that he knew in his disciplinary

20 hearings about Ernst, Hennig and Osborne, but he didn't know

21 about the names of the other people.

22         MR. DIEDERICH:  Just a simple question on

23 rebuttal -- just a simple question on rebuttal, which is, did

24 he know the identity of these people while he --

25         THE COURT:  Which people?

Sue Ghorayeb,  Official Court Reporter

Freeman-direct-Collins

1            MR. DIEDERICH:  Freeman and --

2            THE COURT:  Morel?

3            MR. DIEDERICH:  -- and Dillon.

4            THE COURT:  And Snedeker?

5            MR. DIEDERICH:  And Snedeker.

6            THE COURT:  That's it.  He's going to testify that

7    he didn't know their names at the time of the disciplinary

8    proceedings?

9            MR. DIEDERICH:  At the beginning of the case,

10   correct, Your Honor.  That's all.

11           THE COURT:  I'm sorry?

12           MR. DIEDERICH:  That's all.  At the beginning of the

13   case, when he filed his grievance way back --

14           THE COURT:  That's not the beginning of the case.

15   That's before he filed.

16           MR. DIEDERICH:  Before the lawsuit, yes, Your Honor.

17           THE COURT:  Okay.

18           MR. DIEDERICH:  That he didn't know the identity.

19   That's all.

20           THE COURT:  And what's your position on that?

21           MS. COLLINS:  Your Honor, we --

22           THE COURT:  Yes or no.  Do you think it's

23   appropriate rebuttal or not?

24           MS. COLLINS:  No, Your Honor.

25           THE COURT:  I agree.  Denied.  Next, next proffer.

1              MR. DIEDERICH:  Next issue, Your Honor, is the

2      defense case was built on my client was not -- was in the

3      recreation yard, and we had evidence that my client could not

4      have been in the recreation yard because he was on recreation

5      restriction.

6              I would like my client to testify briefly that he

7      was not on medical runs and was not receiving medication

8      during that time.  Therefore, he would have been in his cell

9      and would not have been in the recreation yard.  And that --

10             THE COURT:  How is that rebuttal?  I'm missing --

11     what -- what exactly is that rebutting?

12             MR. DIEDERICH:  The defense -- the case -- defense

13     that my client was brought from the recreation yard with an

14     allegation of suspicious activity, to the F and G corridor.

15             THE COURT:  Which was always part of the case, and,

16     actually, it was part of your own case when you called their

17     witnesses.  You called their -- the Defendants as witnesses.

18             MR. DIEDERICH:  Correct, Your Honor, but

19     respectfully --

20             THE COURT:  So, he knew about that before he

21     testified, right, before he --

22             MR. DIEDERICH:  Well --

23             THE COURT:  He knew about what other witnesses were

24     going to say because it's in the -- it's in the Pretrial Order

25     and it's also -- it was also what they testified to on your

1  case.

2  MR. DIEDERICH:  But in fairness, Your Honor, my

3  client should be able to explain in his direct case that he

4  was beaten up, allow the Defendants on their case to explain

5  why he was -- these things were justified and what happened

6  from the defense point of view, and they did that by saying --

7  THE COURT:  So, tell me exactly, precisely.  Tell me

8  what the questions are.  Question --

9  MR. DIEDERICH:  Were you -- were you --

10  THE COURT:  Question:  Mr. Anderson --

11  MR. DIEDERICH:  Mr. Anderson, were you on recreation

12  restriction status?  Answer:  Yes.

13  THE COURT:  That's already in the record repeatedly,

14  maybe ten or 15 times.

15  MR. DIEDERICH:  And were you also not at that time

16  receiving medication?  Answer:  Yes.  And were you not on the

17  medication roster?  Answer:  Yes.  And if you were receiving

18  medication, would you have then, as a normal part of

19  procedure, gone to the dispensary and have them sign out

20  paperwork that you were dispensed medication?  Answer:  Yes.

21  Done with that issue, Your Honor.

22  THE COURT:  Ms. Collins.

23  MS. COLLINS:  Your Honor, that is not a proper

24  rebuttal.

25  THE COURT:  Why not?

1              MS. COLLINS:  Because those issues have always been

2      a part of this case.  This is nothing new.  There's no

3      surprise.  This has been Defendants' position since day one,

4      Your Honor.  Mr. Anderson -- Mr. Diederich has just

5      represented that in fairness, the Plaintiff should be allowed

6      to come up here and testify, as he could have on his own

7      direct testimony, to things that were known to him throughout

8      the course of this case.

9              There has been discovery, Mr. -- Your Honor.  Mr.

10     Diederich has been given the documents that show that that --

11     including his own disciplinary hearing, that Defendants'

12     contention was that he was in the yard and he was taken out

13     of that yard on that night.  There's -- there's no surprise

14     here.  There's -- there's nothing that has been --

15             THE COURT:  All right.  So, in other words, if he

16     wanted to explain or present evidence not only that he was not

17     in the yard, which he has already testified to.  He said, "I

18     wasn't in the yard.  That's a complete lie.  It's a

19     fabrication."  But if he wanted to buttress that by saying,

20     "And I couldn't have been in the yard because I had a

21     restriction," he also testified to that, so that's already in

22     the record.  And -- but the last piece of it is about the

23     medical stuff, that "I wasn't receiving medication.  I didn't

24     go to the infirmary, and, therefore, I couldn't have had

25     Neurontin in my pocket."  I think that's the gist of what Mr.

1   Diederich wants to elicit.

2           MS. COLLINS:  That's also information that Mr.

3   Anderson knew previously.  If in fact he was not on

4   medication, he could have testified to that.  In addition, Mr.

5   Diederich could have cross-examined Dr. Bentivegna, who had

6   Mr. Anderson's medical records, as to what medications, if

7   any, he was on on that date.

8           THE COURT:  Yeah, I agree with you.

9           MR. DIEDERICH:  Your Honor, my client and I didn't

10  know the Defendants were going to assert as a defense -- they

11  came up with it at trial.  It's the first time I heard, first

12  time it's anywhere, that they're saying my client, even though

13  he was on recreation restriction, that he could have ended up

14  in the recreation yard.  That came up for the first time, Your

15  Honor, on the defense case.

16          There's no information whatsoever giving us notice

17  of how my client could've somehow ended up in the recreation

18  yard.  It's the first time that was raised in the defense

19  case, and my client is entitled to be able to say, "No, I

20  couldn't have been in the recreation yard because" -- this is

21  new.  We couldn't have anticipated this defense.  But my

22  client is entitled to say, "I couldn't have been on it

23  because I was not receiving medication, I was not on the

24  medication roster, and I didn't go to the clinic and -- and

25  if I did, they would have had documents."

Freeman-direct-Collins

1          That's all new, Your Honor, as rebutting the

2     defense case, and my client should be able to let --

3          THE COURT:  All right.  I'm going to allow Mr.

4     Anderson to testify very briefly, and I mean, super-briefly,

5     that -- to the last couple questions you asked.

6          What else?

7          MR. DIEDERICH:  Just that --

8          THE COURT:  What else, Mr. Diederich?

9          Don't say just that.  Just tell me -- just answer

10    my question.  It's not a hard question.  What else?

11         MR. DIEDERICH:  That, that -- question:  Mr.

12    Anderson, are the security personnel at E Block -- do they

13    keep track of your movement and whereabouts?  Answer:  Yes.

14    And they knew he was in the cell during that time.  End of

15    question.

16         THE COURT:  Keep track of your movement.  He could

17    certainly have testified to that on his direct.

18         MR. DIEDERICH:  Well, but, Your Honor, it wasn't

19    until the defense case that the defense is coming up with the

20    suggestion that my client actually did go to a medical and

21    then, you know, somehow --

22         THE COURT:  All right.  I will allow it.  Let's go.

23    Get the jury.

24         MS. COLLINS:  Your Honor, I would respectfully --

25         THE COURT:  Get the jury.

Sue Ghorayeb,  Official Court Reporter

1                Get on the stand, Mr. Anderson.

2                (Jury present in the courtroom)

3                THE COURT:  Okay.  Welcome back.  Have a seat.

4                Okay.  I'm going to allow the Plaintiff to present

5        a brief rebuttal through the Plaintiff being re-called to the

6        stand.

7                Go ahead, Mr. Diederich.

8                THE CLERK:  The Court reminds you you're still under

9        oath.

10               THE WITNESS:  Thanks.

11               MR. DIEDERICH:  Thank you, Your Honor.

12       JEROME ANDERSON

13       having first been duly sworn, was examined and testified as

14       follows:

15       DIRECT EXAMINATION

16       BY MR. DIEDERICH:

17       Q.   Mr. Anderson were you -- withdrawn.

18               Mr. Anderson, did you go -- go on a medication run

19       to the prison infirmary on April 11th, 2015?

20       A.   No.

21       Q.   Why not?

22       A.   Because I was no longer on medication at the time.

23       Q.   Were you able then to go to the infirmary?

24       A.   No.

25       Q.   And when you do in the past -- when you had in the past

1    gone to the infirmary and obtained prescription drugs, does

2    the infirmary document such issuance of drugs?

3    A.   Yes.

4    Q.   And on April 11th, 2015, did the correction personnel of

5    E Block know at all times your whereabouts?

6    A.   Yes.

7              MR. DIEDERICH:  No further questions, Your Honor.

8              THE COURT:  Okay.  Any cross.

9              MS. COLLINS:  Yes, Your Honor.

10   CROSS-EXAMINATION

11   BY MS. COLLINS:

12   Q.   Mr. Anderson, if you had been escorted to speak with

13   Sergeant Osborne on the evening of February 11th, 2015, from E

14   Block, wouldn't it have been noted in the E Block logbooks

15   that you were taken from your cell to be questioned by this

16   individual?

17   A.   I mean, one would think so, but I won't -- me personally,

18   I don't know the OC's routine.  I don't -- I couldn't answer

19   that.  But one would think, you know.

20   Q.   Mr. Anderson, wasn't there a yard run on the evening of

21   April 11th, 2015, from E Block to the E and F yard?

22   A.   Yes.

23   Q.   And isn't it possible that you snuck into that yard run?

24   A.   No.

25   Q.   And isn't there a medication run that went from E Block

Diederich—Summation

1   being a New Yorker until he was ten years old; maybe we have

2   an attitude about certain things.  But abuse is something

3   that a lot of people think, I -- if I'm abused, I want to do

4   something about it.  So, he's in court because he feels and

5   experienced abuse, and that's what I'm -- the first point I

6   wish to make.

7           What's money going to do for him other than

8   perhaps, as we indicated before, allow him to appeal certain

9   things, you know, regarding his long sentence or confinement.

10          Okay.  So, let me do a bottom line -- oh, one other

11  thing.  We all have implicit biases, I mean, unconscious

12  things.  So, I ask you, again, when you place yourself --

13  selves in the shoes of my client, ask to view him as a

14  person.  There's nothing in the record that shows he's an

15  evil person.  There's nothing in the record that shows he is

16  a violent person.  He is a person that, as a child, ended up

17  in a reform school and has been incarcerated.  But everybody

18  likes freedom and autonomy.  That's a basic human thing.

19          And you can go over, as I indicated in my opening

20  statement and my client gave you this in his direct

21  testimony, he experienced -- yeah, he was frustrated,

22  disheartened, devastated when, for example, after two years

23  of working in the world on parole, he was violated by parole

24  for traveling to New York but, nevertheless, coming back, and

25  that's another two years, okay; then another two years of

Diederich–Summation

1    at that because he wants information, and he wants

2    information, and I'll respectfully suggest to you that he was

3    the aggressor and either punched or slapped or pushed, did

4    something.  Sergeant Osborne did something, an act of

5    violence, toward my client, and the moment he did that,

6    violence ensued.  And if, for example -- and I don't know

7    what happened.  I wasn't there.

8            If, for example, Officer Hennig was present but not

9    looking and didn't see the slap or the punch from Osborne to

10   my client -- and the same thing with Ernst.  If he was just

11   doing something else, not paying attention, Osborne gets mad,

12   irate, does an act of force, slap, a punch, something, knocks

13   my client off his feet, it looks like whatever.  Now,

14   suddenly, the others, "oh, our Sergeant is being attacked."

15   That's one scenario.  Oh, suddenly -- they didn't see it --

16   "our Sergeant is being attacked," and then they join in.

17   Because what do you do if your Sergeant is being attacked?

18           Okay.  A second scenario would be they were paying

19   attention, and they were there designed to intimidate, and

20   they did see Sergeant Osborne strike my client.  And then

21   same thing.  Then a melee ensues and, and -- as to that,

22   let's think about that for a second.  Think about every

23   aspect of it.  For trained professionals, do we, do we really

24   believe, as to trained Correctional Officer professionals,

25   when Osborne is interrogating my client, that my client is

Sue Ghorayeb,  Official Court Reporter

1  suddenly, is suddenly going to be able to one, two, three,

2  four punches to the face?

3          Do you really -- can anybody plausibly believe

4  that?  I would suggest no, because that's not what happened.

5          Those would be very ill-trained Corrections

6  Officers if, if, if Officer Hennig and Sergeant Osborne

7  allowed two punches to the face as described.  So, I don't

8  think you can credibly believe that.  So, the story is

9  different from what they're, they're telling you.

10          Another aspect of -- well, let me just go on with

11  common sense.  Counsel, you know, was talking about the five

12  minutes.  I think, if you ask your children, your friends,

13  about something that happened, how long it happened, people

14  almost always -- the length of time seems so much longer.

15          When counsel was timing the thirty seconds, didn't

16  that seem like more than thirty seconds?  It seemed like

17  forever, didn't it?  I mean -- and that's how -- your mind is

18  not geared as a stopwatch.  So, what happened that may have

19  taken a minute may seem like five minutes.  So, I don't think

20  you should, you know, fault my client for believing the time

21  was longer than it actually was, especially if you believe,

22  as I'm suggesting you do, that he did not anticipate being

23  assaulted by Sergeant Osborne and then having the others, you

24  know, pile on with the altercation.

25          Once again, regarding an assault, my client has

1   never -- apart from the allegations in this incident, he has

2   never assaulted a Correction Officer in his whole time

3   incarcerated, from age 19 to his 53 now.  This is five years

4   ago.  Never assaulted a Correction Officer.  What's,

5   what's -- and more so, you heard him testify as to what he

6   experienced in the prison since Alabama.  He knows the

7   adverse consequences when you have Correction Officers

8   against you.  He has experienced it, the hitching post, the

9   Mexican Jail, the F-Troop.  He has experienced that.

10          And what I'll also suggest to you is, let's give

11  the benefit of the doubt to all of the Corrections Officers

12  except Sergeant Osborne.  As to all of them, we could give

13  them the benefit of the doubt, that Ernst and Hennig did not

14  see, because they weren't paying attention, didn't see

15  Sergeant Osborne, you know, strike my client and start the

16  fight, that they piled on, and then once that happened and

17  word got out that an inmate, namely Anderson, physically

18  assaulted and punched a Sergeant, what do you think happens

19  in that maximum security prison environment regarding the

20  staff?  Are they gonna tolerate that, or are they gonna sort

21  of additionally teach a little bit of a lesson that you don't

22  assault a Sergeant?

23          So, let me suggest to you that after that initial

24  altercation that they had my client get down to the floor,

25  the other things my client described are a natural

1  consequence of what, in a paramilitary organization, namely,

2  the staff of -- the Correction Officers' staff, that that

3  staff united in, you know, we have a problem child here, this

4  inmate that assaulted a Sergeant.

5       Some more details.  You heard, and I suggest you go

6  back to the record, you heard the details regarding how my

7  client was brought down to the ground.  What I would suggest

8  to you, and you can look at the bench, what I suggest to you

9  is he wasn't facing the bench when they took his feet out

10  from him, feet out from under him.  He had his back to the

11  bench when his feet were taken out, which meant, if your feet

12  are taken out this way, your thigh didn't hit the bench.

13       And what other means were there present for my

14  client to suffer a serious thigh injury, swollen, the medical

15  records, five minutes after the incident when he's brought

16  in?  So, when he already has swollen thigh, how did that

17  happen?  It didn't happen from falling on the floor.  It

18  didn't happen from hitting the bench.  I mean, I think even

19  if he was turned that way, that wouldn't be enough force to

20  do that kind of injury.  That thigh, where he got brought in

21  at medical staff's direction for x-rays, presumably for a

22  broken femur, that's a serious injury, and that did not

23  happen by means of anything that the Defendants have

24  described in this case.

25       So, let's continue.  So my client is brought down

Diederich-Summation

1    to the floor, and then he's subdued.  He's put in handcuffs.

2    And you can be the judge of the players after that.  What I

3    would suggest to you regarding some of the memory issues are

4    this:  That memory is a tricky thing.  We've, we've heard

5    about -- in the news about people who are wrongfully

6    convicted by victims who knew this was unequivocally the

7    person who assaulted me, who did a terrible thing to me.  And

8    then we find out from DNA evidence or other things that it

9    was all a faulty memory.  The person didn't maliciously

10   accuse, but the memory plays tricks.  You start thinking, oh,

11   this is the person, and suddenly it becomes.

12          And my client, remember, he's in a maximum security

13   prison that he then left.  So, he didn't know, other than the

14   first players -- I mean, he knew Osborne.  He knew Morel.  He

15   knew Ernst.  But these other players, he had to find out

16   through -- as best he could through other means.  You know,

17   initially it was a John Doe or trying to figure out who these

18   other players are.  And some of them he saw for the first

19   time here, here in court.  And in trying to identify people.

20          So, I ask you to consider that memory can be

21   faulty, and espe- -- let me emphasize the point with, if you

22   are unexpectedly, brutally attacked physically, beaten, how

23   good is your memory gonna be around all of those events every

24   step of the way?  I mean, you heard opposing counsel talk

25   about him being escorted by one Correction Officer right

Sue Ghorayeb,  Official Court Reporter

1   after this.  That's his memory.  Do we really believe that?

2   Do we believe that somebody who just allegedly violently

3   assaulted a Sergeant is going to be escorted by one officer

4   anywhere in that building?  I don't think so.  So, his memory

5   is not perfect, so I hope you'll consider that in your

6   deliberations.

7         Let's continue.  So, my client was brought in by

8   Hennig from his cell, 'cause he's on recreation restriction.

9   And there's no documentation that shows other than he's on

10  recreation restriction.  There's no documentation showing he

11  was issued -- dispensed any medication from the clinic, that

12  he was on the roster to go there.  Conveniently, this

13  institution really doesn't have video cameras, so we don't

14  know what the video evidence would have been, if there had

15  been.  So, there is no, no documents showing him going to the

16  yard.  But opposing counsel would have you believe, in a

17  maximum security prison, he just is able to suddenly be out

18  in the yard.

19        Okay.  Next question will be, well, why would he go

20  to the yard?  To recreate?  I guess there is several things,

21  but he is on recreational restriction.  If he goes to the

22  yard and they realize it, what are they going to do?  They

23  are going to give him another discipline for being out of

24  place.  And his -- you look at the record.  His recreational

25  restriction was only going to -- it was going to end just a

Diederich—Summation

1    few days later.  So, he can wait a few days rather than, you

2    know, subject himself to a possible another disciplinary

3    penalty.

4            Okay.  So, he's -- like I said, he's in the cell,

5    and there's no documents showing that he's anywhere other

6    than his cell.  And you would think that the leaders of the E

7    block would know where their maximum security inmates are.

8            Okay.  So, continuing.  We have a situation where,

9    as opposing counsel argued, a vicious assault upon two

10   Corrections Officers.  Blows to the face.  And as you'll see

11   from the documents, Officer Hennig even filed accusatory

12   instrument, People of the State of New York against my client

13   regarding that.  And they're telling us now he was out of

14   place.  Where are the disciplinary charges, and where are the

15   criminal charges?  I think that is a huge omission that you

16   need to consider.  Because if Sergeant Osborne and Officer

17   Hennig were out of the blue brutally assaulted by my client,

18   out of the blue, for a reason that he has, according to them,

19   two pills of a drug that Dr. Bentivegna indicated he doesn't

20   even know why the Neurontin is actually on the abusive drug

21   list.  You heard Dr. Bentivegna on that.  He contradicts what

22   opposing counsel said.  He was questioning whether Neurontin

23   should be a drug that you worry about.  But be that as it

24   may.

25           So, we have two assaults.  How come there's not

Sue Ghorayeb,  Official Court Reporter

1    criminal charges?  How come there's not a -- there was a

2    disciplinary action regarding the assault, but not dealing

3    with the being out of place.  And why not the criminal

4    charge?  And what I would suggest to you is this:  That after

5    the fact, after -- maybe not even after the fact.  If the

6    Defendants knew that they were the perpetrators, they were

7    the aggressors, or Sergeant Osborne was the aggressor and

8    then the others joined in, they probably don't want really a

9    big deal investigation, criminal charges.  What happens if my

10   client gets a defense counsel?  They start looking into the

11   records to see where he was, to see whether he was, in fact,

12   in the recreation yard, where they find out no, he wasn't in

13   the recreation yard.

14           So, let's now skip ahead, using, again, my client's

15   version, which I think you'll find the most plausible

16   version.  He was brought in by Hennig, slapped or punched or

17   whatever.  Officer Osborne lost his temper and initiated an

18   altercation.  Now we have a big altercation.  My client

19   trying to defend himself because he's being attacked.  Maybe

20   two of the officers thinking my client was the aggressor.

21   Who knows, but whatever.  We have my client now badly beaten,

22   injured.

23           Okay.  Now, what is Sergeant Osborne to do?  He

24   can't explain -- under this version of events, he can't

25   explain why my client was -- to his superiors, he can't

1  explain why my client was in the E and F yard.  Because he

2  brought him there for a bad motive, to inquire about IG.  So,

3  he has a problem, because he has an -- now he has a major

4  confrontation, major fight, which, like I said, they don't

5  ever really prosecute.  So, let's not really look closely,

6  notwithstanding the terrible assault upon these two officers.

7  So, you have a major fight.  And how is Sergeant Osborne

8  gonna answer to his superiors?  Well, that's simple.  And the

9  simplicity is admitted by opposing counsel.  She said, it's

10 simple, what happened.  And what I'm suggesting to you, it's

11 either simple that it happened or it's very simple to invent.

12 These officers already knew that you have contraband.  They

13 presumed, erroneously -- and that's the problem.  They got

14 caught in this big lie.  But they assumed, erroneously, that

15 my client was, in fact, in the rec yard.  So, it was simple.

16 They're going to, you know what -- Ernst -- maybe Ernst came

17 up with the idea.  You know what?  Oh, yeah, he looked

18 suspicious.  I found drugs on him.  Two pills.  And when we

19 confronted him with it, he got -- became irate and attacked

20 us.  Okay.  That's a simple, simple story to concoct.

21 Because you know what?  Because it probably happens often.  I

22 think they did -- the witnesses did testify that there's

23 often contraband found.  The procedure is, if we suspect

24 somebody, we bring him in for the pat frisk, and that's what

25 we do.  So, this was an easy story to concoct, except what I

1    suggest you do, ask you to do, please do, look at the

2    documents.  Closely at the documents.

3           So, they concoct the story about an hour and a half

4    or two later, and then that's the story.  Simple explanation

5    as to why the officers did nothing wrong, and my client did,

6    you know, a big major assault on two officers and then had to

7    serve 300 days in the SHU and also, you know, experience the

8    whole thing.

9           Okay.  So, let me go through some of those

10   documents.  This -- you know what?  I'm -- yes.  Okay.  This

11   is Plaintiff's Exhibit, Plaintiff's Exhibit 5.  It's Officer

12   Hennig's statement.  And what I would suggest to you -- I

13   don't know if you can read it there, but what I would suggest

14   to you is this:  When Officer Hennig writes in this document

15   only that he's performing his duties as a Correction Officer

16   and not going into the details, I would suggest to you at

17   that, at this point in time, he already -- he didn't want to

18   put himself out on a limb, because he did know that he

19   brought my client from E block, from his cell, to the rec

20   yard.  So, he didn't want to put himself out on the limb at

21   this point in time.

22          Later, on the same day, he wrote a accusatory

23   instrument, a supporting deposition, People of the State of

24   New York versus Jerome Anderson, relating to getting struck

25   in the face by my client.  Where did that criminal charge go?

1    Nothing happened.  Not pursued because Hennig was aware

2    there's a problem if this is thoroughly investigated.

3              We also have -- now, now, a month later, Officer

4    Hennig, now that Anderson is raising this issue that, no, he

5    wasn't brought in from the yard, he was brought in from his

6    cell, now we have Officer Hennig stating affirmatively, oh,

7    no, I didn't bring him from E block myself.  So, now he's

8    joining in with his compatriots in their story.  Sergeant --

9    I'm sorry, Officer Ernst, he wrote a statement on April 11th

10   too.  And his statement is the statement that contains the

11   fabricated excuse that, you know, he, Ernst, brought my

12   client from the yard into the E and F corridor.  And he has

13   more detail in his statement.  And please, please consider

14   the little inconsistencies here.  As you heard in the

15   testimony, Ernst supposedly brought my client in from the

16   yard, and he supposedly brought him in on suspicion because

17   he's wearing too much, too many clothes and had his hands --

18   one hand in his pocket.  But so, then, why didn't Ernst do

19   the pat frisk?  It doesn't make sense that Hennig would,

20   would, would do that.

21             We have from Plaintiff's Exhibit 15 that Officer

22   Snedeker arrived on the scene.  I would suggest he was

23   involved in some of the injuries to the wrist because of the

24   handcuffing.  You can look at that exhibit on your own.

25             But let me call your attention to Sergeant

1    alleging that as a result of Sergeant Osborne's actions,

2    other officers gratuitously added injury through force.

3            Opposing counsel is correct that I certainly would

4    like to elicit sympathy for my client, but let me phrase

5    that -- let me argue it a little bit differently.  With the

6    entire story you've heard from my client, I suggest that

7    it's -- it should break your heart.  It's tragic.  Because I

8    think -- I hope you'll agree, from what you've heard from

9    him, he tried to crack a joke on the stand.  He has tried to

10   come across as a person, right.  But his life is, is a

11   tragedy.  And, and the tragedy is, yes, it's part his own

12   making.  He shouldn't have had a love relationship that, when

13   it went sour, he says, I insist on you taking me somewhere

14   and grabbing her purse.  Okay.  But he is 18.  He shouldn't

15   have, have escaped, twice.  But what I'm asking you to

16   consider is this:  Both places were Departments of

17   Correction.  A Correctional Facility.  What does the word

18   "correction" mean?  Doesn't it mean to straighten you out, to

19   rehabilitate you, to allow you to go back to society?  Does

20   it mean, when you make a mistake and go to New York to visit

21   relatives and come back, then it's another two years?  Is

22   that correctional?

23           And you've probably read in the papers about the

24   Alabama systems and the U.S. Attorney going after them, but

25   you know --

1           MS. COLLINS:  Objection.

2           MR. DIEDERICH:  -- in New York State --

3           THE COURT:  Sustained.

4           MR. DIEDERICH:  -- in New York State, we also have a

5   correctional system, DOCCS.  And you heard the Deputy

6   Superintendent testify, and it seemed to me he wasn't

7   testifying that the job of Corrections Officers is to correct.

8   It's to warehouse.  Oh, other people do the correction part.

9   Come on.  And if the job is to warehouse and your main job is

10  to keep them from escaping from all the little things that you

11  need, justifiably need for order and safety in a facility --

12  but if your, your main focus, or your only focus, is that and

13  not rehabilitation, I would submit there's something wrong.

14  And that just might be, when somebody like my client is in for

15  37 years and -- I mean, logically, why should he have any

16  hope, you know, that you're going to maybe do some -- go out

17  of -- whatever.  Do some marijuana.  He's just a human being

18  under a circumstance that is, yes, partly of his own making,

19  largely of his own making.  Escaping is definitely of your own

20  making.  But if you escape or try to escape because you're

21  desperate, I'm just saying maybe the system, the correctional

22  system, is doing wrong there.

23           So, that brings me to my final point, which is the

24  rule of law.  If nothing, if nothing else, the correctional

25  system should instill the rule of law.  And that means a

**Diederich-Summation**

1   the rule of law.  So, I think there's a big problem that you

2   should see regarding that, and ask how did that -- what's

3   your common sense?  How did that happen?  Three experienced

4   Correction -- Correctional Officers, in the presence of an

5   inmate who has two little pills that are Neurontin, a nothing

6   pill, and somehow that becomes an extreme assault.  And, once

7   again, I'll return to, if it was such an extreme assault, why

8   wasn't he, then, brought on criminal charges and further time

9   added?

10          So, in sum -- well, one other point.  You have the

11  opportunity in this case to award both damages and punitive

12  damages.  Let me go to punitive damages first.  I would

13  submit to you that this is a very, very rare case that we

14  caught the correctional officer in a lie.  Because they

15  didn't realize that he was on recreation restriction, and

16  that's why everything is written like it is, and then we

17  caught them.  They didn't -- they just -- it was too simple a

18  story.  Oh, pull him in from the yard.  He has drugs.  He was

19  violent.  They didn't realize at the time he was on

20  recreational restriction.  And there's no documents showing

21  anything contrary to him being in his cell.  Doesn't show

22  that he picked up medication, signed for medication, was

23  released for medication.  Right?  Today they're saying, oh,

24  well, he's good at escaping, so he must have done it.  But

25  why would he do that if he's -- his recreation restriction

1   ends in a few days anyway?  Why would he subject himself to a

2   charge of being out of place?

3          And, by the way, there was never, ever a charge of

4   being out of place against him.  So, what I would suggest to

5   you is all those factors indicate a concocted scheme based

6   upon Sergeant Osborne's action.  And as to that, and Sergeant

7   Osborne, and if you believe the other two officers were part

8   of that, I think they too should be held accountable by

9   having an award of punitive damages, which are designed to

10  deter conduct, so that other officers know, you know what?

11  You can't basically concoct a case because you've done wrong.

12          In this case, I submit to you, we -- bless you.  In

13  this case, I'd submit we have caught them in the big lie.

14  And that's why punitive damages are in order, at a minimum,

15  as to Sergeant Osborne, and perhaps, depending on your view

16  of the other Defendants.  For example, Sergeant Osborne might

17  have just told Officer Hennig, you know, fetch Anderson, but

18  it looked like he also wanted Ernst to be there.  And I think

19  that's the, that's a problem.  And then there was all the

20  other stuff afterwards, as I indicated from my looking at

21  Officer Hennig's affidavit -- statement, rather, he didn't

22  want to go out on a limb initially.

23          Okay.  So, then we get to damages.  Compensatory

24  damages, which are not designed to punish, they're designed

25  to make my client whole.  And I would request that you

Diederich-Summation

1    consider that -- consider him as if he were a free man.

2    Because I don't think it's fair for you to consider him as an

3    inmate, what's he going to do with money, if you award him

4    money.  Like I suggested, or as he testified to, I think he

5    could use it, because I think his story is sympathetic.  And

6    if he had somehow found money, he could use that to find

7    maybe a means of getting clemency, appeals, I mean, various

8    things.  But I ask you to not view him as wearing prison

9    garb.  Get out of your head that he has a long prison

10   sentence, and just award damages as if he were anyone else,

11   because I think that's the only fair way to deal with it.

12           And as to damages, I think you've heard his

13   testimony.  We're not -- I don't want to exaggerate the

14   claim, and I'm not going to exaggerate the claims.  I think

15   you should look -- listen to what he testified to, look at

16   the medical documents.  I'm not, I'm -- contrary to what

17   opposing counsel said, I'm not challenging those, those

18   documents.  I did some cross-examination of Dr. Bentivegna.

19   Well, did my client ask you to write other things down?  I'm

20   not going to second-guess a physician as to you write

21   everything down just because the patient wants you to.

22           So, I'm fine with you reviewing the medical records

23   as they stand.  And as they stand, they show significant

24   injuries.  They show immediate swelling of thigh.  They show

25   other injuries.  They show he was brought to the hospital and

Diederich-Summation

1    assessed there, with x-rays taken, and then subsequently, I

2    believe, chest, for the ribs.  I think there's plenty of

3    evidence to show that he was -- my client was beaten up.

4              And as to a monetary award, I think you should

5    assess something fair.  As to punitives, let me suggest that

6    a punitive damage award that would be equivalent to, for

7    example, if a government employee who does wrong is suspended

8    without pay as punishment for six months.  Would that be fair

9    to, to demonstrate the point to the employee?  And I would, I

10   would suggest that that might be a way of considering

11   punitive damages.

12             And as to damages compensatory damages, there's two

13   aspects of it, the physical pain and suffering that my client

14   suffered when being beaten, and, secondly, you know, the

15   mental.  So, he testified, you know, this was, you know, a

16   terribly traumatic experience for him, so I hope you'll

17   consider the mental aspect, I hope you'll consider the mental

18   aspect of it as well.

19             In conclusion, in conclusion, we shouldn't treat

20   inmates like animals.  We should treat inmates like people

21   if -- and that's what the law requires.  And when that's

22   done, that's the way that you rehabilitate people, and that's

23   the way you return them to society.  And I, I personally hope

24   someday this man will be returned to society.  And all I ask

25   you to do is do your best job at reviewing the evidence and

Diederich—Summation

1    granting him justice as you see it.  Thank you.

2              THE COURT:  Okay.  Thank you, Mr. Diederich.

3              Okay.  We'll take a ten-minute break.  And then,

4    when we come back, I'll give you my final instructions.

5              Remember, keep an open mind.  Don't discuss the

6    case.  Do not discuss the case amongst yourselves or with

7    anyone else.  That will happen soon enough.

8              I'll see you in ten minutes.

9              (Jury not present in the courtroom)

10             (Recess)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                 (Jury present in the courtroom)

2                 THE COURT:  Okay.  Welcome back everybody.

3                 Have a seat.

4                 MS. COLLINS:  Your Honor, if I may.

5                 THE COURT:  If you may what?

6                 MS. COLLINS:  Defendants would like to make an

7       application at the side bar.

8                 THE COURT:  After the jury came out you want to make

9       an application at the side bar?

10                MS. COLLINS:  I apologize, Your Honor.

11                THE COURT:  You should have told me before the jury

12      came out.

13                (At side bar)

14                MS. COLLINS:  Your Honor, at this time -- I

15      apologize for the timing of this, but I have to make a note

16      for the record that, Your Honor, Mr. Diederich's closing

17      argument, there were so many places that -- it was, first,

18      very difficult to follow, but I believe it crossed the line

19      from argument into testimony in so many different places.

20                THE COURT:  What do you want me to do, strike it?

21                MS. COLLINS:  Yes.

22                THE COURT:  Okay.  Denied.  Let's go back.

23                MS. COLLINS:  There's one more application.

24                THE COURT:  I'm kinda shocked that you would

25      interrupt the jury as to this.  What kind of look do you think

Jury Charge

1    that creates for you?

2              MS. COLLINS:  I apologize.

3              THE COURT:  It's not me, it's you.  You're the one

4    getting hurt by it.

5              MS. COLLINS:  I just want to put this on the record.

6              THE COURT:  I get it.  You should have done it

7    before they came out.  Go ahead, finish.

8              MS. COLLINS:  Your Honor, we would request an

9    additional in limine instruction.  Mr. Diederich argued on

10   cross-examination that the supporting deposition of Officer

11   Hennig had some sort of negative inference by the fact that

12   there were no criminal charges brought against his client.  We

13   would request that the Court instruct the jury that the

14   determination of whether or not criminal charges can or cannot

15   be brought is a decision made by the D.A.'s Office and not

16   DOCCS.

17             THE COURT:  Denied.

18             MS. COLLINS:  Thank you, Your Honor.

19             (In open court)

20             THE COURT:  Okay.  Ladies and gentlemen, we're

21   almost at the point where you will begin your final function

22   as jurors, which is to deliberate on a verdict.  But before

23   you do that, I need to give you my final instructions on the

24   law.  When you retire to deliberate, I'll send in several

25   copies of these instructions, so you will be free to consult