UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
JEROME ANDERSON,                             :
                     Plaintiff,      :
v.                                           :
                                                     :   **OPINION AND ORDER**
SGT. ROBERT OSBORNE;                         :
C.O. MATTHEW ERNST;                          :   17 CV 539 (VB)
C.O. JAMES HENNIG; and                       :
C.O. ROBERT SNEDEKER,                        :
                     Defendants.     :
--------------------------------------------------------------x

Briccetti, J.:

      Plaintiff Jerome Anderson commenced this action pursuant to 42 U.S.C. § 1983, alleging defendants Sergeant ("Sgt.") Robert Osborne and Correction Officers ("C.O.s") Matthew Ernst, James Hennig, and Robert Snedeker, among others, used excessive force against plaintiff, in violation of his Eighth Amendment right to be free from cruel and unusual punishment, while he was incarcerated at Green Haven Correctional Facility ("Green Haven").

      On February 14, 2020, after a four-day trial, the jury returned a verdict in plaintiff's favor. On February 24, 2020, the Court entered Judgment for plaintiff, comprising compensatory damages in the amount of $75,000 against all four defendants, as well as punitive damages of $275,000 against Sgt. Osborne, $125,000 against C.O. Ernst, $125,000 against C.O. Hennig, and $50,000 against C.O. Snedeker. (Doc. #133).

      Now pending is defendants' renewed motion for judgment as a matter of law ("JMOL") pursuant to Rule 50(b), or, in the alternative, for a new trial pursuant to Rule 59, or to vacate or remit the damages awards. (Doc. #146).

      For the following reasons, the motion is DENIED.

## DISCUSSION

I.     Renewed Motion for JMOL

Defendants argue (i) there is a complete absence of evidence to support a finding that plaintiff's injuries were proximately caused by defendants, (ii) the verdict against C.O. Snedeker was sheer conjecture, and (iii) plaintiff's injuries demonstrate that any use of force against him was de minimis.

The Court disagrees.

A.     Legal Standard

On a motion for JMOL under Rule 50(b), "a court may set aside the verdict only if there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded persons could not arrive at a verdict against it." Cash v. County of Erie, 654 F.3d 324, 333 (2d Cir. 2011).[1]

In reviewing a Rule 50 motion, the court "'must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence.'" Cross v. N.Y.C. Transit Auth., 417 F.3d 241, 247 (2d Cir. 2005) (quoting Reeves v. Sanderson Plumbing Prods. Inc., 530 U.S. 133, 150 (2000)). The court cannot "substitute its judgment for that of the jury." Wiercinski v. Mangia 57, Inc., 787 F.3d 106, 112 (2d Cir. 2015). For these reasons, the movant's burden in securing relief is "particularly heavy after the jury has deliberated in the case and actually returned its verdict." Cross v. N.Y.C. Transit Auth., 417 F.3d at 248.

---

[1] Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, and alterations.

"Because the Rule 50(b) motion is only a renewal of the preverdict motion, it can be granted only on grounds advanced in the preverdict motion." Lore v. City of Syracuse, 670 F.3d 127, 153 (2d Cir. 2012) (quoting Fed. R. Civ. P. 50 Advisory Committee Note (2006)). "As to any issue on which proper Rule 50 motions were not made, JMOL may not properly be granted . . . unless that action is required to prevent manifest injustice." Id.

B.      Application

Here, although the parties' respective views of what happened were hotly disputed at trial, the record contains sufficient evidence supporting the jury's verdict, and the evidence in favor of defendants is not so overwhelming that reasonable and fair-minded persons could not have arrived at a verdict against defendants.

C.O. Ernst testified that at about 7:00 p.m. on April 11, 2015, he observed plaintiff acting suspiciously in the E&F recreation yard ("E&F yard") at Green Haven, and as a result he was brought by C.O. Ernst to the F&G Corridor to be pat-frisked by C.O. Hennig. C.O. Hennig testified he found two white pills later identified as Neurontin, a pain killer, in plaintiff's pocket, and requested that Sgt. Osborne report to the F&G Corridor to question plaintiff. C.O.s Ernst and Hennig and Sgt. Osborne all testified that after Sgt. Osborne began to question plaintiff, plaintiff became irritated, punched Sgt. Osborne in the face, and also punched C.O. Hennig while Sgt. Osborne and C.O.s Ernst and Hennig attempted to restrain plaintiff. C.O. Ernst further testified that plaintiff was then successfully restrained and placed in handcuffs, and other officers came and escorted plaintiff away. C.O. Snedeker testified that he responded to the F&G Corridor after plaintiff was already restrained and in handcuffs, and thereafter escorted plaintiff

3

to the Special Housing Unit ("SHU").  Following an examination by medical staff, plaintiff was taken to an outside hospital for further evaluation.

Defendants' theory of the case suggested it was possible for plaintiff to have snuck out of his cell on E-Block and entered the E&F yard on April 11, 2015, and that he did so.  For instance, non-party Deputy Superintendent of Security, Thomas Melville, testified that an inmate may join a medication escort simply by telling the escorting officer that he needed to visit the infirmary for medication, and also that an escorting officer typically would not know whether any particular inmate had a loss of recreation restriction at the time.  C.O. Hennig testified that he completed the 7:00 p.m. E-Block medication run on April 11, and did not know if any of the inmates on the medication run were prohibited from recreating at the time.  Thus, defendants submitted, it was possible for plaintiff to have joined the April 11 medication run around 7:00 p.m., and then continued to the E&F yard for recreation after the medication run.  Accordingly, defendants submitted plaintiff snuck out of his cell on E-Block around 7:00 p.m. with the group of inmates who were escorted by C.O. Hennig to the infirmary to receive medication, and, thereafter, to the E&F yard for recreation, which is how plaintiff wound up in the E&F yard.

Plaintiff's version of the April 11 incident was very different.  He testified that two weeks before the incident, he was interviewed by an investigator from the Office of Special Investigations ("OSI") concerning "[s]omething about a Sergeant and sexual harassment."  (Tr. 414).  Plaintiff stated that during this interview, other inmates and officers were present in the area when plaintiff was questioned by the OSI investigator, including Sg. Osborne.  (Tr. 333).

Plaintiff further testified that on the evening of April 11 he was not in the E&F yard, but rather in his cell.  He testified he could not have been in the E&F yard because, at the time, he

4

was on a "loss of recreation" restriction and "was not allowed to go outside . . . with regular population." (Tr. 334–35). He claimed that C.O. Hennig came to his cell and brought plaintiff to the F&G Corridor, an area without video surveillance. According to plaintiff, C.O. Hennig told him a sergeant wanted to speak with him.

Plaintiff further testified that Sgt. Osborne and C.O. Ernst were waiting in the F&G Corridor when C.O. Hennig and plaintiff arrived. According to plaintiff, Sgt. Osborne asked plaintiff what he had told the OSI investigator two weeks prior, and plaintiff responded that he did not want to discuss the matter. Plaintiff testified Sgt. Osborne then told plaintiff to place his hands on the wall, and then punched plaintiff in the face. Plaintiff further testified that Sgt. Osborne, along with C.O.s Hennig and Ernst, continued to strike plaintiff, pushed him to the floor, and stomped, hit, and kicked him while he was on the floor. Plaintiff also testified that several other officers came and joined in the beating, and that the beating lasted for several minutes.

The jury plainly credited plaintiff's version of events, which is supported by testimony and record evidence. Indeed, plaintiff was not on medication on April 11, 2015, and there was no evidence he received medication from the infirmary on that date. Accordingly, the jury had sufficient reason to believe plaintiff was not among the group of E-Block inmates who were escorted to the infirmary around 7:00 p.m. and then escorted to the E&F yard to recreate. Indeed, C.O. Hennig testified that if plaintiff had visited and received medication from the infirmary on April 11, there likely would be a record of such event. No such record was presented at trial. Moreover, correction officers did not find any medication in plaintiff's cell during a search following the April 11 incident.

In addition, the record evidence demonstrates that on April 11, 2015, plaintiff was on restricted recreation status, meaning he was not allowed to be in the E&F yard with general population to recreate. Accordingly, although defendants' theory of the case was that plaintiff left his cell with C.O. Hennig and other inmates for the 7:00 p.m. escort to the infirmary and, thereafter, the E&F yard (because C.O. Hennig was not aware plaintiff was on restricted recreation), the jury clearly discredited this theory in view of plaintiff's recreation restriction and absence of any need to visit the infirmary on that date.

Moreover, the record contains sufficient evidence for the jury to have believed plaintiff's injuries were more than de minimis. Testimony and other record evidence demonstrated that when plaintiff was taken to the medical clinic for an evaluation following the incident, infirmary staff decided to send plaintiff to an outside hospital for further evaluation because of significant swelling in his upper thigh area and to confirm plaintiff did not have any broken bones. The medical evidence further indicated plaintiff sustained bruising on his hands and toes, scrapes to his body, was ambulating with a limp, and complained of pain to his head, ribs, and other parts of his body. Given this evidence, the jury had sufficient reason to believe plaintiff's injuries were more than de minimis, and that Green Haven medical staff would not have sent plaintiff for an outside evaluation had plaintiff sustained only minor injuries.

As an additional matter, the jury concluded plaintiff did not prove by a preponderance of the evidence that two other defendants, C.O.s Warren Freeman and Jose Morel, used excessive force against plaintiff. During trial, plaintiff testified that those defendants escorted plaintiff from the F&G Corridor to the SHU after the assault, and later to the infirmary, and that those

6

defendants used excessive force during the escort. The jury's verdict in favor of C.O.s Freeman and Morel further demonstrates the jury's careful discrimination as to the evidence.

Finally, because C.O. Snedeker testified he was in the F&G Corridor at around the same time as the excessive force incident, and because plaintiff testified "other officers" in addition to Sgt. Osborne, C.O. Hennig, and C.O. Ernst came and joined in the beating, drawing all reasonable inferences in plaintiff's favor, there was some evidence supporting the jury's verdict that C.O. Snedeker was one of the other officers. Although C.O. Snedeker testified he arrived at the scene only after plaintiff was restrained and in handcuffs, this created a disputed issue of fact that the jury resolved in plaintiff's favor. Indeed, plaintiff's version of the events suggests that all the defendants, including C.O. Snedeker, fabricated a story to cover up their assault of plaintiff. Thus, plaintiff's version suggests that C.O. Snedeker lied about his involvement in the incident. The jury resolved this credibility issue in plaintiff's favor.

Accordingly, for the above reasons, and because "a court may set aside the verdict only if there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded persons could not arrive at a verdict against it," Cash v. County of Erie, 654 F.3d at 333, judgment as a matter of law in favor of defendants is unwarranted and improper.

II.     Motion for New Trial

Defendants argue they are entitled to a new trial because (i) the jury's verdict was against the weight of the credible evidence and (ii) plaintiff's counsel engaged in improper and prejudicial misconduct during the trial.

7

The Court disagrees.

A.    Legal Standard

A "court may, on motion, grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a)(1)(A).

Whether to grant a new trial pursuant to Rule 59 is in the district court's sound discretion. Sequa Corp. v. GBJ Corp., 156 F.3d 136, 143 (2d Cir. 1998).  "[F]or a district court to order a new trial under Rule 59(a), it must conclude that the jury has reached a seriously erroneous result or the verdict is a miscarriage of justice, i.e., it must view the jury's verdict as against the weight of the evidence."  Manley v. AmBase Corp., 337 F.3d 237, 245 (2d Cir. 2003).  In other words, "[a] court considering a Rule 59 motion for a new trial . . . should only grant such a motion when the jury's verdict is egregious."  DLC Mgmt. Corp. v. Town of Hyde Park, 163 F.3d 124, 134 (2d Cir. 1998).

In considering whether a jury's verdict is against the weight of the evidence such that a new trial is warranted, the district judge is "free to weigh the evidence and assess the credibility of the witnesses and need not view [the evidence] in the light most favorable to the verdict winner."  Scherer v. Kane, 284 F. App'x 850, 854 (2d Cir. 2008) (summary order).  Indeed, "[t]he court must consider [any purported] error in light of the entire record when evaluating whether a new trial is warranted."  Ojeda v. Metro. Transp. Auth., 2020 WL 4497843, at *6 (S.D.N.Y. Aug. 3, 2020).

8

B.     Weight of Credible Evidence

For the reasons discussed above,[2] the jury did not reach an erroneous result in light of the trial evidence, nor a verdict that signifies a miscarriage of justice.  Contrary to defendants' arguments that plaintiff's account of the April 11, 2015, incident was "fantastic and vague," and "unsupported" by the record (Doc. #147 at 11), there exists credible evidence that Sgt. Osborne and C.O.s Ernst, Hennig, and Snedeker used excessive force against plaintiff as the jury concluded had occurred.  Moreover, defendants' claim that plaintiff failed to describe details of the April 11 incident falls well short given plaintiff's testimony about the events that transpired from when he was escorted from his cell to the F&G Corridor to speak with Sgt. Osborne.  Indeed, given the conflicting evidence presented at trial, the jury concluded plaintiff's testimony and other credible record evidence supported plaintiff's version of events, not defendants'.

C.     Counsel's Conduct

Defendants further contend a new trial is warranted on the basis that plaintiff's counsel engaged in improper and prejudicial misconduct during the trial.  Specifically, defendants argue plaintiff's counsel made false statements to the Court to procure plaintiff's rebuttal testimony, made numerous inflammatory and testimonial misrepresentations, and blatantly appealed to the sympathy of the jury.

The Court disagrees.

When considering a motion for a new trial premised on the alleged misconduct of opposing counsel, the court must consider the claim "in the context of the trial as a whole, examining, among other things, the totality of the circumstances, including the nature of the

---

[2]     See infra § I.B.

comments, their frequency, their possible relevancy to the real issues before the jury, and the manner in which the parties and the court treated the comments." Okraynets v. Metro. Transp. Auth., 555 F. Supp. 2d 420, 429 (S.D.N.Y. 2008).

"Obviously not all misconduct of counsel taints a verdict to such a degree as to warrant a new trial." Pappas v. Middle Earth Condo. Ass'n, 963 F.2d 534, 540 (2d Cir. 1992). Rather, a new trial is warranted only "when the conduct of counsel . . . causes prejudice to the opposing party and unfairly influences a jury's verdict." Id. "Trial courts possess broad discretion to determine when the conduct of counsel is so improper as to warrant a new trial." Matthews v. CTI Container Trans. Int'l Inc., 871 F.2d 270, 278 (2d Cir. 1998).

During the trial, plaintiff's counsel sought to re-call plaintiff to testify that he did not know the identities of all of the individuals involved in the April 11, 2015, use of force incident before he filed this case. The Court sustained defense counsel's objection to such additional testimony. Plaintiff's counsel further proffered that plaintiff would testify on rebuttal that he was not on medication or any medication roster on April 11, that when he had visited the infirmary in the past, the infirmary documented the issuance of medication to plaintiff, and that if plaintiff had gone to the infirmary on April 11, his housing block would have been aware of this. Plaintiff's counsel argued rebuttal was necessary to address defendants' asserted defense that "plaintiff could have ended up in the recreation yard" even though he was on recreation restriction. (Tr. at 608–09). Over defense counsel's objection, the Court allowed plaintiff a brief rebuttal, comprising four questions consistent with plaintiff's counsel's proffer.

Although perhaps cumulative, plaintiff's rebuttal testimony did not so prejudice defendants or have a profound effect on the jury such that a new trial is warranted. Indeed,

defense counsel cross-examined plaintiff following his direct testimony on rebuttal, during which plaintiff acknowledged, albeit reluctantly, that it was possible for him to escape from a prison—in light of the fact that he had done so in the past—and also that on several occasions he had been found "out of place" in prison. (Tr. at 613).

Defendants also argue they were unfairly precluded from introducing evidence to rebut plaintiff's contention that his housing block would have had a record that he joined the infirmary escort on April 11, 2015, if he had in fact done so, because a defense witness who had testified the day before was not available to be re-called following plaintiff's rebuttal testimony. Yet defendants did not raise this issue at trial, or object to plaintiff's testimony in this regard, or seek to re-call the witness in question. Accordingly, the Court is not persuaded by this argument or that defendants were unfairly prejudiced by plaintiff's rebuttal testimony.

Defendants further contend plaintiff's counsel's summation was improper and warrants a new trial.

Following plaintiff's counsel's summation and a brief recess, defense counsel moved to strike plaintiff's counsel's summation. The Court denied the application, concluding plaintiff's counsel's summation was not "unreasonable or excessive," and noting defense counsel did not object to the summation when given. (Tr. at 732).

Upon careful review of plaintiff's counsel's summation (see Tr. at 676–703), the Court confirms its earlier ruling and concludes the summation did not severely prejudice defendants, and, accordingly, does not warrant a new trial. In his summation, plaintiff's counsel submitted the record evidence supported plaintiff's theory of the case, recounted evidence of plaintiff's

disciplinary history, and requested the jury to consider their common knowledge on certain issues in determining the facts and the credibility of the witnesses.

Moreover, the Court instructed the jury, following counsel's summations, that "[a]rguments by the attorneys are not evidence, because the attorneys are not witnesses. What they have said to you in their opening statements and their summations is intended to help you understand the evidence to reach your verdict. If your recollection of the evidence differs from the statements made by the lawyers in their opening statements or summations, it is your recollection that controls." (Tr. at 718–19). The Court further instructed the jury: "Discuss and weigh your respective opinions dispassionately, without regard to sympathy, without prejudice or favor toward any party, and adopt that conclusion which in your good conscience appears to be in accordance with the truth." (Id. at 725). The Court presumes the jury followed these instructions. Accordingly, the Court is not persuaded by defendants' contentions.

The Court is also unpersuaded by defendants' argument that plaintiff's counsel engaged in other improper, prejudicial conduct that warrants a new trial. Throughout the trial, defense counsel objected to certain questions posed by plaintiff's counsel, the Court responded to each objection individually, and the Court sustained defense counsel's objections when appropriate.

Accordingly, the Court rejects defendants' contention that the cumulative effect of plaintiff's counsel's alleged misconduct during the proceedings substantially prejudiced defendants and warrants a new trial.

III.     Vacatur or Remittitur of Damages Awards

Defendants argue that if the jury's verdict is upheld, the compensatory damages award should be vacated or remitted because it is unsupported by the record evidence, and that the

jury's punitive damages awards should be vacated or remitted because they are unsupported by the record evidence and excessive.

The Court disagrees.

"While is it properly within the province of the jury to calculate damages, there is an upper limit, and whether that has been surpassed is not a question of fact with respect to which reasonable persons may differ, but a question of law." MacMillan v. Millenium Broadway Hotel, 873 F. Supp. 2d 546, 559 (S.D.N.Y. 2012).

A.  Compensatory Damages

"A plaintiff in an action pursuant to 42 U.S.C. § 1983 . . . is entitled to compensatory damages for pecuniary loss, humiliation, injuries, damage to reputation, mental anguish and suffering." Manganiello v. Agostini, 2008 WL 5159776, at *18 (S.D.N.Y. Dec. 9, 2008) (citing Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S. 299, 306 (1986)).  "To recover compensatory damages . . . , a plaintiff must prove that his injuries were proximately caused by the constitutional violation." Gibeau v. Nellis, 18 F.3d 107, 110 (2d Cir. 1994).

"With respect to a compensatory damages award, '[i]f a district court finds that a verdict is excessive, it may order a new trial, a new trial limited to damages, or, under the practice of remittitur, may condition a denial of a motion for a new trial on the plaintiff's accepting damages in a reduced amount.'" Guzman v. Jay, 303 F.R.D. 186, 196 (S.D.N.Y. 2014) (quoting Lee v. Edwards, 101 F.3d 805, 808 (2d Cir. 1996)).

In this case, the Court instructed the jury that compensatory damages may be awarded for "any injury, physical or emotional, that you find Plaintiff has proven he actually sustained as a proximate result of the misconduct." (Tr. at 715). The Court further noted there exists "no

requirement that evidence of the monetary value of such intangible things as pain and suffering be introduced into evidence," but that "to recover damages for such injuries, the Plaintiff must present credible evidence regarding such injuries." (Id.). Moreover, the Court informed the jury that compensatory damages may be awarded for emotional harm "during and after the events complained of," that evidence of "medical treatment for an emotional injury, while helpful, is not required," and that "Plaintiff must present credible evidence showing such emotional harm" for a damages award for such harm to be reasonable. (Id.).

Here, the jury's $75,000 compensatory damages award is reasonable in light of the jury's assessment of the credible evidence, as discussed herein. The jury credited plaintiff's testimony and concluded Sgt. Osborne and C.O.s Ernst, Hennig, and Snedeker used excessive and unwarranted force against plaintiff in the F&G Corridor on April 11, 2015, causing plaintiff to sustain documented physical injuries. Moreover, that the jury found against Sgt. Osborne and C.O.s Ernst, Hennig, and Snedeker with regard to what transpired in the F&G Corridor, yet found in favor of C.O.s Freeman and Morel with regard to other alleged incidents of excessive force following the F&G Corridor incident, demonstrates the jury attributed plaintiff's physical injuries to the conduct of Sgt. Osborne and C.O.s Ernst, Hennig, and Snedeker. Moreover, plaintiff testified he experienced emotional harm following the incident in that he was fearful of further excessive force incidents and had difficulty sleeping.

For these reasons, the jury's $75,000 compensatory damages award is supported by credible record evidence and not "clearly outside the maximum limit of a reasonable range." See Guzman v. Jay, 303 F.R.D. at 197.

B.      Punitive Damages

"Punitive damages are available in a § 1983 action 'when a defendant's conduct is shown to be motivated by an evil motive or intent or when it involved reckless or callous indifference to the federally protected rights of others." Thomas v. Kelly, 903 F. Supp. 2d 237, 265 (S.D.N.Y. 2012). "Although a jury as wide discretion, a district court may refuse to uphold a punitive damage award when the amount is 'so high as to shock the judicial conscience and constitute a denial of justice.'" Id. at 265–66 (quoting Lee v. Edwards, 101 F.3d at 808). The Second Circuit instructs that "[i]n gauging excessiveness, [courts] must keep in mind the purpose of punitive damages:  to punish the defendant and to deter him and others from similar conduct in the future." Lee v. Edwards, 101 F.3d at 809.

"In determining whether a punitive damages award is excessive, federal trial courts reviewing a jury's verdict should relate the facts of the underlying case, construed in the light most favorable to the nonmoving party, to the three guideposts used by the Supreme Court in BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S. Ct. 1589, 134 L.Ed.2d 809 (1996)." Thomas v. Kelly, 903 F. Supp. 2d at 266. These three guideposts are the:  (i) "degree of reprehensibility" of the defendant's conduct; (ii) "disparity between the harm or potential harm and the punitive damages award"; and (iii) "difference between the remedy and the civil penalties authorized or imposed in comparable cases." DiSorbo v. Hoy, 343 F.3d 172, 186 (2d Cir. 2003) (citing BMW of N. Am., Inc. v. Gore, 517 U.S. at 574–75).

With respect to the first factor, "certain aggravating factors that are associated with particularly reprehensible conduct and contribute to the sense some wrongs are more blameworthy than others" include "whether a defendant's conduct was violent or presented a

15

threat of violence" and "whether a defendant acted with deceit or malice as opposed to acting with mere negligence." Lee v. Edwards, 101 F.3d at 809.  Moreover, this first factor is "[p]erhaps the most important indicium of the reasonableness of a punitive damages award." BMW of N. Am., Inc. v. Gore, 517 U.S. at 575.

Here, the evidence at trial supports a finding that defendants' conduct was particularly reprehensible.  The jury found Sgt. Osborne and C.O.s Ernst, Hennig, and Snedeker used excessive force to violently beat and subdue plaintiff for declining to discuss with Sgt. Osborne plaintiff's conversation with an OSI investigator.  "This was not an act of mere negligence; it was an assault intended to cause" plaintiff physical and emotional harm.  See Jackson v. Tellado, 2018 WL 4043150, at *7 (E.D.N.Y. Aug. 24, 2018).  The evidence credited by the jury demonstrates the extreme reprehensibility of defendants' conduct.

With respect to the second guidepost, "[c]ourts often consider the ratio of the punitive damages award to the compensatory award, and consider whether that ratio is reasonable in the circumstances of the case." Thomas v. Kelly, 903 F. Supp. 2d at 267.  "The Supreme Court has repeatedly stressed the impossibility of making any bright-line test as the propriety of the ratio can vary enormously with the particular facts of the case." Id.  Indeed, "in cases of very small injury but very reprehensible conduct, the appropriate ratios can be very high." Id.

Although courts have held that a 4:1 ratio "might be close to the line of constitutional impropriety," "a ratio higher than 4:1 may comport with due process in cases where a particularly egregious act" at issue does not appear to be have been measured within the awarded compensatory damages.  See Rosas v. Balter Sales Co., 2018 WL 3199253, at *11 (S.D.N.Y.

16

June 29, 2018) (citing State Farm Mut. Auto Ins. Co. v. Campbell, 538 U.S. 408, 424–25 (2003)).

Despite defendants' arguments to the contrary, here, the ratio between the punitive and compensatory damages awards (7.67:1) does not "shock the judicial conscience." Lee v. Edwards, 101 F.3d at 808.  Clearly, the jury concluded plaintiff was punched, stomped, and beaten without provocation.  Furthermore, in crediting plaintiff's version of events, the jury plainly discredited the defendants' testimony and other record evidence, and concluded defendants lied to cover up their use of unprovoked, excessive force against plaintiff, an inmate in their charge.

The jury's varying punitive damages awards against each defendant further demonstrates the jury's careful discrimination as to the evidence, and that the jury separately weighed each defendant's conduct in view of his individual culpability.  Moreover, the ratio of punitive damages to compensatory damages for each individual defendant is less than 4:1 in each case.

Finally, the total punitive damages award, $575,000, rendered against the four defendants in varying amounts ranging from $50,000 to $275,000, is reasonable under the circumstances when compared to similar excessive force cases.  See, e.g., Jackson v. Tellado, 2018 WL 4043150, at *9 (collecting cases and discussing punitive damages awards in excessive force cases).

In short, the punitive damages awards were neither unsupported by the record evidence nor excessive.

## CONCLUSION

Defendants' motion for judgment as a matter of law pursuant to Rule 50(b), or, in the alternative, for a new trial pursuant to Rule 59, or to vacate or remit the damages awards, is DENIED.

The Clerk is instructed to terminate the motion. (Doc. #146).

Dated: October 20, 2020
       White Plains, NY

SO ORDERED:

_____
Vincent L. Briccetti
United States District Judge