**MICHAEL D. DIEDERICH, JR.**
*Attorney at Law*
**361 Route 210
Stony Point, NY 10980
(845) 942-0795
(845) 942-0796 (fax)
www.DiederichLaw.com**

*Law Practice concentrating in employment law,
employment discrimination, civil rights law*

VIA ECF

June 1, 2021

Hon. Vincent L. Briccetti, U.S.D.J.
U.S. Courthouse
300 Quarropas Street
White Plains, NY 10601

RE: *Anderson v. Sgt. Osborne et al*, 17 Civ. 0539—
Diederich Retainer & Attorney Fee application

Dear Judge Briccetti:

Per Your Honor's directive at the telephone conference held on May 3, 2021, this letter explains Plaintiff's position as to the above-referenced matter.

### *"Pro Bono" representation*

"Pro bono" is a shortened version of the Latin phrase *pro bono publico*, meaning "for the public good."[1] As an attorney who handles civil rights and worker-side employment cases, I advocate in favor of persons who are victim to unlawful conduct, whether by private employers or by governmental actors.

In the past, I have volunteered my services to the SDNY's Pro Bono panel. My recollection regarding a case I handled long ago (perhaps in the 1990s; I think his name was Kovis Brown) is that the Pro Bono panel referred me a prisoner rights violation case, which I brought to a jury trial. As I recall, I was unable to establish a §1983 violation, but did establish a common law clam, and the jury awarded my client a verdict of $15,000 of which I took $5,000 as my fee. I had previously confirmed with the SDNY Pro Bono Panel's representative that I was allowed to have a retainer agreement allowing my recovery of fees if I won the case. Because my client did not prevail on his §1983 claim, there was no claim for attorney's fees under §1988.

---

[1] See, Merriam-Webster dictionary, "History and Etymology for *pro bono;* https://www.merriam-webster.com/dictionary/pro bono.

When I offered to represent Mr. Anderson here, a *pro se* litigant, one reason was to assist the Court and the public interest. I suspect that by taking over Mr. Anderson's case, I likely saved the government thousand or tens of thousands of dollars' worth of federal judiciary and state executive department (e.g., DOCCS) time and expense. Without my involvement, I suspect the prisoner's trial may have lasted two weeks of more, instead of only 5 days. I also assume that Mr. Anderson's case, like many or most *pro se* cases, had been reviewed by at one or more private practitioners, and rejected as being economically unviable. Thus, it seems to me that it was of considerable benefit to the taxpayers me to take on this otherwise *pro se* prisoner's case. When I took on the case, my belief was that the case would be very difficult to win. After all, I had no first-hand witnesses, other than Mr. Anderson himself, to testify that there was misconduct.

Based upon these and other factors, it did not even cross my mind that the Court might object to a contingency-fee relationship with Mr. Anderson. Indeed, a principal element of a contingency fee arrangement is that being paid for recovering money gives an attorney an incentive to best represent the client. Moreover, if I would not benefit by receiving sound compensation for success, why would Mr. Anderson assume that I was fully and vigorously representing him, and not simply seeking the Court's favor by "getting the case over with quickly." Why would he accept my advice regarding withdrawing claims or dismissing numerous defendants (as he did in this case)? Why would he not consider filing a bar grievance against me, for perceived lack of vigorous advocacy, if he lost the case that I was handling, or if he disagreed with my post-trial recommendations (or my declining to handle an appeal)?

In sum, why should Inmate Anderson--an African-American abused by a criminal justice system his entire adult lifetime—trust me—a Caucasian from suburban America, and someone whom he might reasonably regard as being part of "the system"—if I had little or no financial incentive to win his case? <u>Answer</u>: he would have scant reason to trust me or the Court in this regard. Why trust an attorney who has no "skin in the game"?

Thus, for the above reasons alone, it makes complete sense that I would enter into a contingency fee arrangement with Inmate Anderson, especially as he was seeking substantial damages.

Contingency fee arrangements provide an incentive for attorneys to take on such cases, whether in personal injury cases or civil rights damages cases. Even more so than personal injury cases, the statistics in civil rights cases reveal (I believe) that a higher percentage of plaintiffs' cases are dismissed before trial than in other civil litigation, and as to the cases that do make it past summary judgment to trial, the damages awards also tend to be much lower.

Moreover, when an attorney does win a civil rights case and obtains a contingency fee, this helps provide the attorney with the financial ability to assist other *pro se* civil rights plaintiffs-in-need in future cases. I received a substantial attorney's fee recovery in this case from Mr. Anderson. This result will, for me, justify my volunteering to take on other *pro se* cases in the future, cognizant of the reality that most such undertakings will likely result in either no recovery at all or only a small or modest recovery.

Respectfully, the Court should have no problem with any attorney (including me in this representation) taking on a case with a contingency fee provision in the attorney-client retainer agreement. I hope the Court will reconsider the views it expressed on May 3, 2021.

**<u>The applicable law</u>**

As to the law, it is clear that 1) an attorney can enter into a contingency fee retainer agreement with a client who had been representing himself *pro se*, and 2) the fee-shifting provisions of 42 U.S.C. § 1988 allow for the award of attorney's fee when the plaintiff substantially prevails, as Mr. Anderson has in this case.

The above are very sound reasons for the Court to have accepted my offer to assist Inmate Anderson, at no out-of-pocket expense to him, with all litigation risks of loss (and expense of litigation, including my driving to Mr. Anderson's distant prison site) borne by me. My risk of being paid nothing or very little in this representation was significant. I was being given a case where each one of a large number of defendants was claiming that Inmate Anderson—an inmate serving a 35 year sentence—was the wrongdoer. Mr. Anderson's injuries were challenged by defendants as being trivial. Punitive damages seemed unlikely.

I never anticipated that offering to provide my services to Mr. Anderson and the Court— and providing a valuable legal service to Mr. Anderson by winning the case—would result in the

Court's disfavor for my seeking to be paid a customary one-third contingency fee in a high risk case that apparently no other attorney was willing to undertake.

### *Contractual Agreement with Prisoner Anderson*

My fee agreement with Mr. Anderson is essentially a straight contingency fee arrangement. It is my standard retainer agreement, except that I, not the client, would bear all litigation costs absent success.

When I sent this Retainer Agreement to Mr. Anderson for his consideration and signature, we discussed some possibilities. Without divulging the content of privileged attorney-client, it is my custom and practice to discuss with my civil rights potential clients the possibility of a small recovery, or a recovery that does not involve a fee award (such as with a negotiated settlement), or the possibility of the case going all the way to a jury verdict, in which case there is also the availability of § 1988 attorney fees (here with the constrained of the Prison Litigation Reform Act ("PLRA")).

### *Section 1988 fee-shifting and Public Policy considerations*

The fee-shifting provisions of 42 U.S.C. § 1988 do not preclude a retainer agreement that includes a contingency fee recovery. The Supreme Court in *Venegas v Mitchell,* 495 U.S. 82 (1990), stated that a §1988 fee award is separate from, and in addition to, a contractually-agreed contingency fee. As the Court stated:,

> "<u>depriving plaintiffs of the option of promising to pay more than the statutory fee if that is necessary to secure counsel of their choice would not further § 1988's general purpose of enabling such plaintiffs in civil rights cases to secure competent counsel</u>.
>
> <u>In sum, §1988 controls what the losing defendant must pay, not what the prevailing plaintiff must pay his lawyer.</u> What a plaintiff may be bound to pay and what an attorney is free to collect under a fee agreement are not necessarily measured by the 'reasonable attorney's fee' that a defendant must pay pursuant to a court order. Section 1988 itself does not interfere with the enforceability of a contingent-fee contract."

*Id.* at 89-90 (*emphasis added*).

My Retainer Agreement with Mr. Anderson provided for a one-third recovery, paid out of proceeds, as to all monies recovered. Thus, under the Retainer Agreement:

➢ As to the $650,000 verdict, the attorney's fee is $216,667.

> ➢ As to, say, a $49,000 attorney's fee award, this amount will be allocated between the attorney and the client as per the contractual agreements of the attorney and the client.

At the present time (and I have an additional phone call scheduled with my client on this subject tomorrow), I anticipate that out of any fee award, Mr. Anderson will authorize payment to Mr. Bergstein of the amount that Mr. Anderson has agreed to (and which he will confirm). I will pay (or authorize the payment of) the balance of any fee award to Mr. Anderson, to partially reimburse him the contingency fee he has paid to me.

Thus, there will be no duplicate or double payment of attorney's fees. I discussed this previously with Mr. Anderson, and discussed it with him again after the May 3, 2021 court conference. I also provided him with a copy of my initial (similar) version of this letter, in draft form, for his consideration. And I am providing him with a copy of this letter.

What I write above is supported by the intent of Congress and the case law. Congress seeks to encourage attorneys to take on representation in civil rights cases to benefit "society at large." *See Blanchard v. Bergeron*, 489 U.S. 87, 95-96 (1989); *see also City of Riverside v. Rivera*, 477 U.S. 561, 575 (1986); *Hensley v. Eckerhart,* 461 U.S. 424, 449 (1983) ("no fee is reasonable unless it would be adequate to induce other attorneys to represent similarly situated clients seeking relief comparable to that obtained in the case at hand"). As the Supreme Court explained in *City of Riverside v. Rivera*:

> "In addition, the damages a plaintiff recovers contributes significantly to the deterrence of civil rights violations in the future. This deterrent effect is particularly evident in the area of individual police misconduct, where injunctive relief generally is unavailable.
>
> Congress expressly recognized that a plaintiff who obtains relief in a civil rights lawsuit "'does so not for himself alone but also as a 'private attorney general,' vindicating a policy that Congress considered of the highest importance." "If the citizen does not have the resources, his day in court is denied him; the congressional policy which he seeks to assert and vindicate goes unvindicated; and the entire Nation, not just the individual citizen, suffers."

*See, id.,* 477 U.S. at 575.

The Congressional edict is that civil rights are important to American society, and that to vindicate such rights, attorneys should be induced by monetary incentives to take on such cases. Any view that attorneys should volunteer for civil rights cases without the prospect of reasonable compensation—either volunteer for a case entirely for free, or work on it on the basis of perhaps receiving a fee award from the defendant, but paid nothing from the client -- contradicts the Supreme Court's market-based view of attorney compensation and its observation in *Hensley* that "attorneys should view civil rights cases as essentially equivalent to other types of work they could do, even though the monetary recoveries in civil rights cases (and hence the funds out of which their clients would pay legal fees) would seldom be equivalent to recoveries in most private-law litigation." 461 U.S. at 447.

Respectfully, it contradicts the public policy and Supreme Court teachings for a court to expect that an attorney agree to take a *pro se* prisoner case on terms different from, say, that of other civil rights clients where the attorney may agree to be paid a fee only if there is a recovery. Why, for example, should Mr. Anderson, a convicted felon serving a 35 year prison sentence, receive a more favorable fee arrangement than an unemployed worker with a civil rights case for unlawful racial bias, or unlawful age bias, or sexual harassment, or because of disability or pregnancy?

*Conclusion*

As I believe I indicated at the court conference, as to any fee award, apart from the sum that Mr. Anderson has agreed to pay Mr. Bergstein for his post-verdict work, I will pay (or will authorize payment of) all of any fee award to Mr. Anderson, which will partially reimburse him for the contingency fee that he has paid to me.

I hope the above satisfactorily addresses the concerns raised by the Court, and that the Court will grant Mr. Anderson's attorney fee application in its entirety.

    Respectfully submitted,

    /S /
    Michael Diederich, Jr.

cc: Bruce Turkle, Asst. Attorney General
    Deanna Collins, Asst. Attorney General
    Stephen Bergstein, Esq.
    *via email & ECF*